### In re RENVILLE et al.

(Supreme Court, Appellate Division, First Department. December 8, 1899.)

1. TELEGRAPH COMPANIES—MANDAMUS—STOCK-EXCHANGE NEWS.

A telegraph company contracted with the New York Stock Exchange, a voluntary association, to transmit stock-market quotations to such persons as the exchange should designate, and to refuse to transmit such information to persons whom it might designate; the telegraph company paying the exchange for the news, and charging the persons so furnished therefor. Petitioner had been furnished such news by the telegraph company prior to the contract, when the company, under order of the exchange, refused him further service, although it had been paid therefor in advance, and although petitioner tendered payment in advance for future service. Laws 1848, c. 265, under which said company was incorporated, as amended and continued by Laws 1855, c. 569, and Laws 1890, c. 566, § 103, provides that telegraph companies shall receive dispatches from other telegraph lines and associations, and from individuals, on payment of the usual charges,

and shall transmit the same, with impartiality and in good faith, in the order in which received; and Laws 1850, c. 340, makes it a misdemeanor for any person connected with a telegraph company to divulge the contents of any message to any person other than to whom directed. *Held,* that petitioner could not compel the telegraph company to furnish him with such news, as the stock exchange was not bound to furnish information concerning its business to any person except those whom it should designate.

**2. MARKET QUOTATIONS—NEWS—PUBLIC RIGHTS.**

Information as to transactions on a stock exchange, which is a voluntary association of persons, whose facilities are limited to its members, is not property clothed with a public interest, so as to entitle persons not members to compel the furnishing of such information against the wishes of the association.

Appeal from special term, New York county.

Petition by George G. Renville for a peremptory mandamus against the Gold & Stock Telegraph Company and others. From an order denying the writ, petitioner appeals. Affirmed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, and INGRAHAM, JJ.

Henry B. Johnson, for appellant.

Rush Taggart, for respondent.

INGRAHAM, J. In this proceeding the appellant seeks to compel the Gold & Stock Telegraph Company to connect a ticker in the petitioner's office with its telegraph wires, and to furnish him with quotations of transactions upon the New York Stock Exchange from time to time, as they are made, in the same manner and for the same price as they are furnished to others. The petition upon which the appellant makes this application alleges that the Gold & Stock Telegraph Company is a domestic corporation organized and existing under the laws of the state of New York; that it was organized under chapter 265 of the Laws of 1848, and acts amendatory thereto; that the said Gold & Stock Telegraph Company availed itself of its franchise granted under such statute, laid its telegraph wires through, in, or under the public streets of New York, from said New York Stock Exchange, in several directions, and has been for upwards of 15 years engaged in the business of collecting reports of the purchases and sales of stocks upon the said New York Stock Exchange from time to time as they occur, and of transmitting the information so obtained, through its instruments, called "stock tickers," to persons and corporations who are not members of the exchange, at their offices and places of business, for pay, and is now engaged in such business; that the charge required from each subscriber for such service, or for each ticker, in the district near the said stock exchange, is $20 per month; that on April 18, 1899, the petitioner applied to the said Gold & Stock Telegraph Company for such information or quotations to be furnished him; that such application was accepted; that said ticker and wire were duly installed; that such information or quotations were furnished for about eight days in May, 1899, at the agreed price of $20 per month, which sum was paid in advance for the month of May; that thereafter, and during the month of May, 1899, for which said service

and quotations were fully paid, the said Gold & Stock Telegraph Company discontinued said service, and cut its wire connected with said ticker, and has ever since refused and neglected further to furnish quotations; that in June, 1899, the petitioner tendered $20 to the said telegraph company to pay in advance for such service or quotations for the month of June, 1899, and that said company refused his money, and also refused to restore or continue such service and the furnishing of such quotations; that the dealings in said stocks upon the New York Stock Exchange aggregate many thousands of shares upon each business day, and that information as to the transactions made upon such exchange is convenient and necessary for the appellant for the proper transaction of his business; that such information and quotations are furnished to a very large number of his fellow brokers and members upon the Consolidated Stock & Petroleum Exchange doing business in the city of New York, and to many other persons and corporations doing business in stocks as brokers and otherwise; and that, by the refusal of the said Gold & Stock Telegraph Company to serve the appellant with such information, he has been, and will be, irretrievably damaged. Subsequently, by a stipulation, the Western Union Telegraph Company was joined as a party to the proceeding, and the petition and the proceedings were amended accordingly; and it was stipulated that the Western Union Telegraph Company was a corporation duly organized under the act for the incorporation of telegraph companies. Act 1848, above specified.

The telegraph company served its answer to said petition, alleging that the property of the Gold & Stock Telegraph Company had been leased to the Western Union Telegraph Company, and that the business of transmitting quotations from the New York Stock Exchange and other exchanges had been and was managed and conducted entirely by the Western Union Telegraph Company; that prior to November 19, 1892, the respondents had been in the habit of collecting information as to the price at which stocks, bonds, and other securities dealt in on such exchange had been sold, and transmitting such information to its subscribers by means of these instruments, but that subsequent to November 19, 1892, the said New York Stock Exchange, availing itself of a right belonging to it, excluded the employés of the said respondent from access to the exchange, itself collected the information, and sold or transferred the same to the Western Union Telegraph Company, which thereupon and thereafter transmitted such information furnished by the New York Stock Exchange or its employés to persons employing it to furnish them with quotations of stocks dealt in upon the New York Stock Exchange; that the said exchange thereafter, for its own protection, and to prevent the improper and illicit use of quotations of stocks dealt in upon the said New York Stock Exchange by bucket shops and persons disposed to use the same for the purpose of defrauding the public, insisted upon its right to dictate the persons who should be entitled to receive the said quotations, and determined to give out the same only to such persons as the said stock exchange was satisfied would use the same properly, and not to the disadvantage or defrauding of the public, and thenceforth refused

longer to sell to or give the said Western Union Telegraph Company the said quotations of stocks, bonds, and other securities dealt in on the New York Stock Exchange, save and subject to the obligation on its part only to transmit the same to such persons as were approved by said New York Stock Exchange; that on the said 19th day of November, 1892, the New York Stock Exchange, acting through its duly-appointed officers, with the duly-appointed officers of the Western Union Telegraph Company, entered into a contract for the purpose of carrying out the above-mentioned policy of the · New York Stock Exchange, a copy of which contract is annexed to the answer.

The said contract expired on June 30, 1897; due notice of its expiration having been given by the stock exchange to the respondents. Subsequent to June 30, 1897, pending the making by the New York Stock Exchange of further or other arrangements with respect to its quotations, it continued said contract in force from day to day after June 30, 1897, in consideration of receiving from the Western Union Telegraph Company, for each day during which said contract shall be so continued in force, the sum of $90, payable at the close of business on each day; it being distinctly understood that all the provisions of said contract, other than those relating to its duration, are to be and remain in force during such temporary continuation of the contract, but that the New York Stock Exchange, or its committee of arrangements, could at any time, without notice, wholly discontinue and terminate said contract, and that upon such discontinuance or termination all rights of the Western Union Telegraph Company thereunder shall forthwith cease and determine. By the agreement between the Western Union Telegraph Company and the New York Stock Exchange, in force prior to June 30, 1897, and which by the arrangements between them was continued from day to day, it was provided that the stock exchange "agrees, at its own cost and expense, to collect, furnish, and transmit to the telegraph company, in the manner herein provided, for distribution by the telegraph company as hereinafter provided, full and continuous reports of the current transactions, news, quotations, and statistics, made or originating in the stock exchange, of such things as are or may be dealt in by the members thereof during the hours for trading prescribed by its rules, and also the changes which may occur in the same from time to time"; the stock exchange to transmit by its own telegraph operators, over the wires of the telegraph company, such information; the telegraph company to receive the same over said wires by their own operators at their main office in the city of New York, and transmit the same over their wires to their customers; the telegraph company to protect its wires so as to render the same, so far as possible, incapable of being tapped, and to use its utmost endeavors to prevent the said reports, or any part thereof, being taken off said wires, or in any way diverted or distributed, prior to their being taken off at said main office; the telegraph company to have the right to serve said reports to the members of the New York Stock Exchange at their offices north of Chambers street, and also the right to serve said reports to all per-

sons, firms, corporations, and organizations in New York City and elsewhere, wherever the telegraph company might desire to serve them, except to organizations or exchanges in the city of New York competing with the New York Stock Exchange, and except to members of the stock exchange south of Chambers street, New York City, and except to persons who may be directly or indirectly engaged in the promotion or maintenance of "bucket shops"; the telegraph company not to contract to furnish tickers, and not to furnish tickers, to any person, firm, corporation, or organization in New York City not already having its instruments, until the application of such firm, corporation, or organization should have been submitted to and approved by at least three members of the committee of arrangements of the stock exchange; and, as its existing contracts expired from time to time, it would not make renewals thereof, or continue to furnish services to such parties in New York City, until their respective applications for renewals should have been in like manner submitted and approved. The purpose of this agreement is obvious. By it the New York Stock Exchange retains control of information as to the transactions made between its members upon its premises, and furnishes such information to the respondents for a specific purpose; the respondents undertaking not to furnish such information to others, except in accordance with the provisions of this agreement. As this agreement continues from day to day, the stock exchange has the privilege of terminating it at any time, and refusing to supply information to the respondents for transmission to others.

The answer also alleges that the appellant applied to the Western Union Telegraph Company to be furnished with quotations; that said application was duly transmitted in good faith by the respondents to the officers of the stock exchange; that the said exchange, for reasons not stated to the respondents, denied such application, and refused to permit such quotations to be furnished by means of a ticker to the appellant, and for that reason the respondents refused to place a ticker in the office of the appellant.

The statute under which the respondents are incorporated (chapter 265 of the Laws of 1848, as amended by chapter 569 of the Laws of 1855) provides that "it shall be the duty of the owner or the association owning any telegraph line doing business within this state to receive despatches from and for other telegraph lines and associations, and from and for any individual, and on payment of their usual charges for individuals for transmitting despatches, as established by the rules and regulations of such telegraph line, to transmit the same with impartiality and good faith; * * *" that "it shall likewise be the duty of every such owner or association to transmit all despatches in the order in which they are received." Such provision is continued in the transportation corporation law (chapter 566 of the Laws of 1890, § 103); and by chapter 340 of the Laws of 1850 it is made a misdemeanor for any person connected with a telegraph company to divulge the contents of any message delivered for transmission, which provision has been continued in the revision of the General Laws. The New York Stock Exchange is a voluntary

association. "It has the right to admit to its floor whom it pleases. It obtained nothing from the state, except that protection which the law affords to every citizen. It has sought no special privilege, and obtained no special powers. It is therefore just as much the master of its own business, and of the method of conducting the same, as any private individual within the state. It may make public the transactions which occur within its walls, or it may refuse all information in respect thereto. No matter which course is pursued, so long as it violates no law, it has a right to conduct its business as it pleases." Telegram Co. v. Smith, 47 Hun, 505; Wilson v. Telegram Co. (Sup.) 3 N. Y. Supp. 633.

This private voluntary association, being thus in control of its own property, and having the absolute right to give information as to the dealings of its members with each other to whom it pleases, and upon such conditions as it pleases to impose, gives certain information to the defendants, to be delivered to certain specified persons, and upon condition that the defendants give such information to such specified individuals, and none other. The appellant, being one of those to whom the stock exchange refused to allow the information furnished by it to the telegraph company to be transmitted, asked the court by mandamus to compel the telegraph company to violate the conditions upon which such information had been received by it, and to furnish such information to him. We fail to see any principle upon which this application could be granted. It may be conceded that the respondents are corporations charged with the performance of public duties, are under the control of the legislature, and may be compelled by mandamus to perform their obligations to the public. The obligation that they assume is to receive and transmit communications. No statute requires a telegraph company to communicate to the public dispatches which it has received from other individuals, to be transmitted to specified persons. On the contrary, such a communication is prohibited. I cannot see that it makes any difference whether a dispatch is given to a telegraph company to be communicated to a single individual, or to be communicated to 10, 100, or 1,000 individuals. Under this agreement between the stock exchange and the respondents, certain information is given to the telegraph company to be communicated to individuals or corporations designated by the stock exchange. Whether we call this information a special dispatch, or general information which the stock exchange desires to communicate, seems to me to be entirely immaterial. The fact that the telegraph company pays to the stock exchange a certain sum of money for the information which it receives to transmit is also immaterial. The substance is that those to whom this information is directed to be given by the stock exchange are willing to pay the stock exchange for such information, and are also willing to pay the telegraph company the expense of transmitting the information. The information delivered to the respondents for transmission is a communication which the stock exchange wishes to transmit to the persons it designates, and to no one else. I can see no reason why the stock exchange should be required to furnish the appellant with

this information, which relates solely to its own business upon its own property, or why the respondents should be required to violate their agreement with the stock exchange and the law of this state, .and furnish to the appellant information which had been communicated to the respondents by the stock exchange for a specific purpose, and none other. An entirely different question wàs presented when the respondents procured the information themselves, and furnished such information to the public. It may be that under such circumstances the respondents were bound to furnish the information thus collected to all persons who were willing to comply with the conditions imposed by the respondents as a condition for rendering the services. There can be no doubt of the fact that the appellant could require the respondents to transmit any communication sent to him from others, or that he wished to send to others; and, if the stock exchange desired to communicate to him information as to the dealings between its members, there could be no doubt of the duty of the respondents to comply with such request. But, until the stock exchange consents to the appellant's receiving such information as it supplies to the telegraph company for transmission, I cannot see that the court has the right to compel the stock exchange to furnish such information to the appellant.

We are referred to several cases from other states,—notably, to the case of New York & Chicago Grain & Stock Exch. v. Board of Trade of City of Chicago, 127 Ill. 153, 19 N. E. 855, 2 L. R. A. 411. The Chicago Board of Trade was a corporation, and the powers of a court of equity over a corporation are much more extensive than over private individuals; but we cannot agree with that decision so far as it appears to justify an interference by the public or the courts with a voluntary association in the transaction of its business because the public desire information as to its transactions. There is, no doubt, much information as to the method by which large corporations, associations, or firms transact their business which would be quite valuable to their competitors, and interesting to the public; but this would hardly be considered as justifying an interference by the courts. The basis of that decision is that as the board had so conducted its affairs for a long term of years as to create a standard market in agricultural products, and, acting in concert or combination with the telegraph companies, built up a great system for the instantaneous communication of the market and its fluctuations, until the public and all persons dealing in such products conform their business to this system, it could not be allowed to create a monopoly in the matter of the market quotations, by furnishing them to some and refusing them to others. It is difficult to see why a voluntary association, because of the importance and character of its business and members, and of their transactions, could be compelled to transmit to a particular individual information of its transactions. It was said in the case last cited:

"We do not wish to be understood as holding that the board of trade is bound by law to continue the business of furnishing to the public market quotations; but we hold that so long as it continues to carry on that trade, either directly or indirectly, it must do so without unjust discrimination as to persons."

Or, in other words, that, because it gives information to one person, it must give the same information to all, and the. court will compel it to give such information to any one asking .therefor. But the question may well be asked, where does the court get this power? No statute gives it. Nothing that these individuals have done, no obligations that they have assumed to the public, no privileges which they have received from the public, gives to the public the right to interfere with their private business, or requires them to give information about it to those who desire such information. No franchise has been conferred upon this voluntary association by the public which justifies an interference by the public with its method of conducting its business; and to grant such an application would, it seems to me, be an interference with the liberty of the individual which is protected by the constitution and the law.

The doctrine established in Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77, and kindred cases, does not apply. No property of the stock exchange has been devoted to public use. The stock exchange excludes the public from its property; restricts the transactions therein to its own members; sends information of such transactions to those whom it designates as the persons that are to receive it. Information as to transactions upon the Stock Exchange is not such property as could be "clothed with a public interest," so that a "grant to the public of an interest in that use" is to be implied. Such information is not property, in any sense, and the public or a particular individual has no right to go to this voluntary association, and insist that information of its transactions should be furnished.

I cannot think, therefore, that the court had power to grant the relief asked for; and the order appealed from should be affirmed, with. $10 costs and disbursements. All concur.