TUCKER v. WESTERN UNION TELEGRAPH CO. et al. (and four other cases).

(Supreme Court, Special Term, Erie County.   June, 1915.)

1. EXCHANGES ☞13—QUOTATIONS.
   A stock exchange has an absolute property right in the quotations collected and compiled by it.

   [Ed. Note.—For other cases, see Exchanges, Cent. Dig. § 16; Dec. Dig. ☞13.]

2. TELEGRAPHS AND TELEPHONES ☞44—FAILURE TO FURNISH MARKET QUOTATIONS.
   Where the right to market quotations is purchased by a telegraph company from a stock exchange, subject to approval by the exchange of applicants for market quotation service, such service may be furnished to one not so approved, who is not shown to be conducting a bucket shop or illegal business, notwithstanding Penal Law (Consol. Laws, c. 40) § 552, forbidding divulging the contents of a telegram.

   [Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. ☞44.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. TELEGRAPHS AND TELEPHONES ⊙══44—FAILURE TO FURNISH MARKET QUOTA-**
**TIONS.**

Such market quotation service is part of the service which a telegraph
company renders under its charter,. and which it must render with impar-
tiality and good faith.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig.
⊙══44.]

**4. INJUNCTION ⊙══67—ADEQUATE REMEDY BY APPLICATION TO PUBLIC SERVICE**
**COMMISSION.**

Where a stockbroker's business is greatly, if not totally, interfered with
by refusal of a telegraph company to furnish him market quotation serv-
ice, he may enjoin discontinuance thereof; his remedy not being restricted
to application to the public service commissions under Public Service Com-
missions Law (Consol. Laws, c. 48) § 97.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 135; Dec. Dig.
⊙══67.]

Suits by Henry C. Tucker, by James F. Dee, by George H. Millener,
by James L. Holland and another, and by Thomas E. Hogan, doing busi-
ness as J. R. Heintz & Co., against the Western Union Telegraph
Company and another. Application by defendants to vacate tempo-
rary injunctions. Denied.

Orders affirmed 156 N. Y. Supp. 1127, 1148.

See, also, 157 N. Y. Supp. 873.

This is an application by the defendants to vacate a temporary in-
junction, heretofore granted in this action, restraining defendants from
discontinuing to furnish to the plaintiffs quotations of the New York
Stock Exchange by means of "ticker" and "fast wire" service. The
New York Stock Exchange, although not a party to this action, was
represented by counsel on the argument.

Simon Fleischmann and James O. Moore, both of Buffalo, for plain-
tiffs.

Hoyt & Spratt, of Buffalo (Rush Taggart, of New York City, of
counsel) for defendants.

John G. Milburn, of New York City, for New York Stock Ex-
change.

POOLEY, J. The complaint alleges, and the answer admits, that
the plaintiff has for a long time past, and now is, engaged in the busi-
ness of dealing in shares of stock, securities, and commodities, and
for that purpose has maintained an office in the city of Buffalo; that
the defendant Western Union Telegraph Company is a domestic pub-
lic service telegraph corporation, under the laws of the state of New
York, and has assumed the obligation to render equal service to the
public, for just and reasonable rates, without favor or discrimination,
and that it maintains and controls and operates various lines of tele-
graph throughout the United States, and between the cities of New
York and Buffalo, by means of which it transmits messages, news,
reports, and other divers forms of information; that the defendant
the Gold & Stock Telegraph Company, is a like domestic public serv-
ice telegraph corporation, controlled by the Western Union Telegraph
Company, and that all of the business of the Gold & Stock Telegraph

⊙══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Company is the business of the Western Union Telegraph Company; that the Western Union Telegraph Company is engaged in transmitting quotations and prices at which divers sales and purchases of bonds, stocks, and commodities have been made upon the various exchanges and boards of trades in the various cities throughout the United States, and among others the purchases and sales of stocks and bonds upon the New York Stock Exchange, and that the Western Union Telegraph Company transmits the said quotations over its telegraph lines for the purpose of distributing the same to persons and corporations who subscribe for such service, and takes the compensation fixed therefor by it; and that it distributes such quotations to its various subscribers by means of a direct telegraph wire, referred to as the "fast wire," to the place of business of the subscriber, and also by means of "tickers" placed in such place of business, which said "tickers" are operated through the Western Union Telegraph Company; that the defendants have a fixed rate for such service in the city of Buffalo, N. Y., of $35 per week for "fast wire" service, and the sum of $6 per week for "ticker" service, and that said defendants are furnishing such service to a large number of subscribers in said city of Buffalo, N. Y.; that for a long time past the plaintiff has been, and now is, a subscriber for the New York Stock Exchange quotations, and that the defendants have furnished the plaintiff with said quotations, by means of said "fast wire" and "tickers," and that the plaintiff has at all times promptly paid the regular and fixed rate for said service, and in all respects complied with the reasonable rules and regulations of the defendants. The complaint further alleges that notwithstanding that the plaintiff has paid to defendants in advance for said services and had complied with all reasonable rules and regulations of the defendants, and is willing to do so in the future, the defendants, without cause and without notice, and with intent to discriminate against the plaintiff, and to injure him in his business, has determined to cut off such service to the plaintiff; that the plaintiff has demanded a continuance of such service, and has informed the defendants that he is willing and financially able to pay the regular compensation therefor; and that he will comply with all reasonable rules and regulations of the defendants in relation to its use, but that the defendants unlawfully and wrongfully refuse, and have refused, to continue such service, although such service will be continued by defendants to divers and various other persons and subscribers in the city of Buffalo and elsewhere in the state of New York and the United States.

The defendants aver that said quotations, particularly the quotations of purchases and sales of stock and bonds upon the New York Stock Exchange, are transmitted under and by virtue of the provisions of a written contract between the New York Stock Exchange and the defendant Telegraph Company. They admit that, subject to the provisions of said contract, the Western Union Telegraph Company transmits said quotations and distributes same to such persons and corporations as subscribe for such service, and pay the compensation required therefor, under the conditions of the said contract under which the "tickers" are operated by the Western Union Telegraph Company, but deny that they are required to furnish such quotations by means of said

ticker service, or otherwise than as set forth in said contract. They admit that the rates of said "ticker" service and "fast wire" service for the quotations of the New York Stock Exchange are uniform and fixed, and that subscribers are entitled to receive the same under the provisions of said contract, and that the rate of said "fast wire" service in the city of Buffalo is $35 per week, and that the rate for the "ticker" service is $6 per week. They admit that they have been furnishing such "ticker" service to a number of subscribers in the city of Buffalo, N. Y., and admit that the plaintiff has been a subscriber for the quotations of the New York Stock Exchange, and has been furnished by the defendant Western Union Telegraph Company with said quotations by means of said "ticker" service and said "fast wire" service, and that the plaintiff has heretofore paid the fixed rates for said service, and has complied with the regulations of the defendant Western Union Telegraph Company, but deny that without cause, and without notice, and with intent to discriminate against the plaintiff, and to injure him in his business, they determine to cut off said "ticker" service, and deny all of the other allegations in the eighth paragraph of the plaintiff's complaint, save the allegation that said "ticker" service will be continued to other persons and subscribers in the city of Buffalo, N. Y., and elsewhere in the United States, under and subject to the provisions of the defendant's contract with the New York Stock Exchange. The defendants then set forth, at length, their several contracts with the New York Stock Exchange, and allege that by virtue of a contract now existing between the defendants and the New York Stock Exchange all applicants for continuous quotations of the New York Stock Exchange must be approved by the New York Stock Exchange before the Western Union Telegraph Company can furnish the quotations desired by said applicants.

It will be seen, therefore, that substantially all the facts alleged in the complaint are admitted, except the charge that the Telegraph Company wrongfully refuses to furnish the service; and the defendants allege in substance that they refuse the service because the Stock Exchange has not approved of plaintiff's application, and that the Telegraph Company is bound by its contract not to furnish the service to the plaintiffs. The issues, therefore, narrow down to the propositions. first, that the Stock Exchange has an absolute property right in the quotations collected and compiled by it; second, that under the contract of July 1, 1914, between the Exchange and the Telegraph Company, the relation of sender and carrier of messages exists, and that to require the Telegraph Company to furnish these quotations to others than those approved by the Stock Exchange would compel a violation of section 552 of the Penal Law.

[1] As to the first proposition, that of an absolute property right in the quotations, there can be no doubt. Bd. of Trade of Chi. v. Christie Grain & Stock Co., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031; Hunt v. N. Y. Cotton Exchange, 205 U. S. 322, 27 Sup. Ct. 529, 51 L. Ed. 821.

[2] As to the second contention, that of the relation of sender and carrier, and of a violation of section 552 of the Penal Law, I cannot agree. Section 552 contemplates a person who wrongfully obtains or

attempts to obtain any knowledge of a telegraphic message, by connivance with a clerk, operator, messenger, or other employé of a telegraph company, or, being such employé, willfully divulges the contents of a message.  It is obvious that this has reference to messages as generally understood, and no doubt would apply to messages sent over private, direct wire, or received privately from a ticker or other instrument.  But the service under discussion is distinct from the ordinary and commonly accepted duty of receiving and delivering messages, and is one which has grown up to meet the demands of business, the quick transmission of market conditions to all parts of the country.  The value of the service is not in its secrecy, but in the publication of the information as soon as it is available.  The office of a broker who has the service is practically a public one, and once the quotation is received it is practically open to any one who desires it.

It cannot be said, therefore, that the Penal Law is violated by such publication.  Publicity of the quotations is of the first importance. While trading at the Exchange between members and their representatives on the floor may be extensive, it is a matter of common knowledge that a very large part of the business comes from brokers at remote points, whose patrons are obliged to depend upon market conditions disclosed by those quotations of actual dealings on the floor. It is because of this service, furnished at frequent intervals, that traders in distant cities are informed of the trend of the market and enabled to determine upon their action.  The province of the Exchange is that of affording facilities to buy and sell, and it is manifestly to its own interests that the buying and selling public know the market conditions.  The nature of the business is such that operators prefer to deal with responsible brokers at their home cities rather than to attempt to trade with members of the Exchange direct, and in order to do this they must have the information necessary to the determination of their orders.  So this system has grown to its present proportions and requires the co-operation of the Exchange, the Telegraph Company, and the brokers in furnishing to patrons the facilities required.  In the nature of things, the business cannot be private and secret, but must be public and instantly available to all.  The question here presented is somewhat different from that involved in the sending and carrying of a message.  The Telegraph Company is a corporation formed for the purpose of transmitting messages, and the statute under which it exists in this state requires it to perform this service with impartiality and good faith, aside from any requirements under the Public Service Commissions Law.  The Stock Exchange is a voluntary association, having a private office, to which none but members are admitted, and here they meet daily, and buy and sell bonds, stocks, etc., as opportunity is given by means of oral offers and bids.  The members of the Exchange operate, not only on their own account, but as representatives or agents of persons not members, and located in all parts of the country.  To facilitate the business, it became the practice to make note of the fluctuations in the bids and offers on the floor, and members were able to send this information to their customers, whereever they might be, by messenger, by post, or by telegraph; the latter being the means principally used for obvious reasons.

The evolution of the business resulted in the ticker, a machine, automatic in its essential features, and the telegraphic equipment was so improved and enlarged that any number of tickers could be operated at the same time, wherever located. The ticker is the property or under the control of the Telegraph Company. The growth of the business and the facility of communications caused the establishment in remote cities of offices where correspondents or customers of members of the Exchange received immediate information by means of the ticker, and it became the practice to post the information on blackboards, so that any person might be informed of transactions occurring on the floor of the Exchange, practically as soon as known there. The business on the floor of the Exchange by these facilities increased to large proportions, and was so productive that the Exchange, instead of its business being confined to individual operations of its members, permitted employés of the Telegraph Company to come in upon the floor, make note of the transactions, and transmit the information broadcast throughout the country. The new development in the brokers' offices resulted, and by contract with the Telegraph Company the brokers had tickers installed in their offices, giving to the public the quotations of all transactions on the floor of the Exchange, by means of which business could be done anywhere with practically the same facility as that of a person on the floor of the Exchange. Assuming that the expense of obtaining this information was only the compensation of its employés who gathered it, the Telegraph Company profited by the rental or sale of the tickers and furnishing the quotations, and also in procuring the business of the return communications by wire between the brokers throughout the country and the operators on the floor of the Exchange. It soon became manifest that these quotations were valuable property, which should yield a profit to the Exchange. The Telegraph Company's employés were excluded from the floor, and the Exchange itself, through its own employés, collected and collated the quotations and delivered them to the Telegraph Company for transmission to its customers who had tickers installed. The business is in no manner changed. The Telegraph Company receives the same quotations and distributes them in the same manner as before; the only difference is that now the Exchange collects and collates them, and delivers them to the Telegraph Company.

It may be assumed that there is no restriction placed upon any member of the Exchange as to the volume of his transactions on the floor, and it may also be assumed that no member would refuse to fill any legitimate offers of business. A broker, therefore, wherever located, would be able to arrange for the filling of his orders on the floor of the Exchange. The more orders received, the greater volume of business, and the greater income to the members of the Exchange and to the Telegraph Company, which furnished the information on which to deal and the quick means of communication between the broker and the member on the floor. If the elements of the business were all embraced in the matters above outlined, it might be urged that the brokers were the agents of the members of the Exchange in procuring business, and through arrangements definitely made the Exchange, on behalf of the member sending to the brokers, by means of the Tel-

egraph Company, private information to enable them to do business, the Telegraph Company would therefore be bound to deliver this information to the persons and to them only, whom the member or the Exchange should designate. The messages would be like ordinary messages, subject to secrecy. Whether they were sent in the common yellow envelope, or were transmitted through the means of the ticker, would make no difference.

But this is not the situation presented by this case. If it were, the Exchange would pay the Telegraph Company for every message so sent, at rates common to all, while the fact is the Telegraph Company pays the Exchange a large sum, presumably not a gift, but a payment made for the purpose of acquiring something. If it were the business of sender and carrier, the Exchange would seek the agents, assume the work, and charge for installing the tickers, while the fact is the Telegraph Company has the responsibility of securing the patrons, installing the equipment, and collecting the cost. If it were the ordinary business of transmitting messages, the Telegraph Company would not pay the Exchange, nor would it contract to do the business for a gross sum, because it is bound to charge uniform rates to all as the messages are presented for transmission. The information, if received over the ticker and retained privately by the broker, might properly be restricted. In the nature of things this would be of comparatively little value. A broker, receiving quotations which he was bound not to publish, would of necessity be obliged to do business with each individual customer, disclosing to him information required in the particular case. It is a matter of common knowledge that this is not and cannot be the method of doing business. The persons desiring to trade want all the information available and at once. It is not generally the case of an individual going to his broker's office, intent upon buying or selling a predetermined commodity, as he would go to the market to buy his household supplies. It is rather that of a trader, ascertaining general conditions, and by reason of his shrewdness sizing up the business situation, availing himself of an opportunity to make a profit. The Exchange does not criticize this publication by brokers doing a legitimate business.

The quotations are in no sense secret communications. They would be well-nigh worthless to the trading public, if kept secret. Their value is measured by the publicity given them. This is manifest from the fact that, immediately a transaction is made, it is quoted and transmitted to all having the tickers to receive it, and it in turn is immediately posted and published to the world. This is the means by which the broker, and through him the member of the Exchange, obtains business. Now the Telegraph Company is the intermediary essential to the transaction of a great volume of business in the Exchange. It could stand strictly upon its statutory duty to furnish impartial service in the transmission of all messages tendered. When the manifolding of the delivery by means of the ticker or any other device to facilitate the transmission became known, it could with propriety secure such devices and offer the same on equal terms to all patrons according to the nature and extent of the service required. If the Exchange or its members desired to extend their business by establishing agencies in

the cities outside of New York, it would be their concern, and not that of the Telegraph Company. The Telegraph Company would have the right to refuse to transmit it, except on the basis of ordinary messages, or any other means whereby equal and impartial service was rendered. It is deemed expedient, however, to enter into an arrangement whereby the Exchange collects the quotations, delivers them to the Telegraph Company to be distributed to its patrons, and for this the Telegraph Company pays the Exchange a large sum of money. No question is raised, although it might be, as to whether or not the Telegraph Company has not gone outside of its corporate powers in paying large sums of money for news to be transmitted broadcast; but, assuming that it is within its rights, it is urged that it cannot legally acquire property or rights in property to be utilized in such a way as to refuse equal facilities to all citizens.

[3] It is part of the "service" which the Telegraph Company renders through its facilities and under its charter, and which it must render with impartiality in good faith. National Tel. News Co. v. Western U. Tel. Co., 119 Fed. 294, 56 C. C. A. 198, 60 L. R. A. 805. It seems to me clear that the service in question is not that of transmitting messages for hire, but that it is that of purchasing rights in information made valuable by its publication; and, assuming that the Telegraph Company has the right to make such purchase, it has not the right to do so unless it has also the right to dispose of it on equal terms to all who may legally require it. But it appears that the information received and transmitted might be, and probably has been, used unlawfully, in gambling transactions and in so-called bucket shops, where the transactions were not bona fide; and the Exchange, desiring to prevent such transactions, determined to control the business to the extent of requiring the Telegraph Company to refuse the service to any one making unlawful or improper use of it. No criticism can be made of this action. It was and is the duty alike of the Exchange and the Telegraph Company to so act. This appears from the record to be the only control that the Exchange has ever claimed to exercise, once the quotations are delivered to the Telegraph Company, and it is specifically so stated in the contract. It is true that the contract also provides that the patrons of the Telegraph Company to receive the service must be approved by the Exchange. But what is the purpose of the approval? Manifestly it is to meet the one objection, that of furnishing the service for unlawful or improper purposes. The Exchange, in the circumstances here shown, cannot under this contract claim the right arbitrarily to deprive a broker doing a legitimate business of the facilities offered by the Telegraph Company, nor can it so restrict the Telegraph Company.

The plaintiffs here have for years had this service, and paid for it, and are prepared to pay for it in the future, and to conform to all reasonable regulations. It is not claimed that they, or either of them, have ever used, or contemplate using, this service for unlawful or improper purposes, or otherwise than in accord with the regulations proposed. The Stock Exchange has the right to refuse to give the quotations. The Telegraph Company may have the right to refuse to furnish the quotations to any one, although it well may be contended that

all its facilities are subject to public control, and that it might in the public interest be compelled to utilize them. But with the Exchange giving the information to the Telegraph Company, knowing that it is to be delivered to various patrons, does it not thereby submit it to the control of the public through its Public Service Commissions Law? The Telegraph Company must conform to these regulations, giving equal and impartial service to all requiring it who conform to the legal requirements. It is apparent that a patron who violates any of the requirements may justly and legally be deprived of the service, but there is no intimation that either of these plaintiffs is charged with any violation, and it appears that for a number of years they have enjoyed this service, have conformed to its requirements, have paid for it, and are prepared to pay for it in the future.

The Stock Exchange and the Telegraph Company have the right to restrict the service to lawful and proper use, and it appears from the contract that it was intended to so restrict it; but to go farther and undertake to grant to one and refuse to another equally entitled would constitute an unlawful discrimination. The contract provides:

"(11) It is understood and agreed that as to the right of the Exchange—to disapprove applicants for quotations—it is the intent only to prevent the unlawful and improper use of such quotations."

There being no claim that plaintiffs have made or will make any unlawful or improper use of the quotations, they cannot arbitrarily be refused the service so long as it is furnished to others in like business. The Telegraph Company is interested in this interpretation of the contract. It pays a large price for the quotations and can only make the service profitable by contracting with a large number of patrons. If the Exchange has the power to restrict the use of the service by refusing those five patrons, it may refuse the service to all the patrons in Buffalo after the Telegraph Company had gone to the expense of extending its wires, and installing its instruments. It seems to me clear that, when by its contract the Exchange says that "it is the intent only to prevent the unlawful and improper use of such quotations," it has reached its legal limit if the service is to be given at all, and the burden is upon it to show a violation of the terms and conditions if it undertakes to deprive a patron of the service.

It is true that the Exchange has the right to refuse to disclose any of the information collected, and it has been held that it being private property it could limit its sale as it chose; but the information is sold for a substantial price to the Telegraph Company and becomes its property, subject to any legitimate restrictions. It could not, if it would, prevent its publication, once it is given to any broker and posted on the bulletin or blackboard. It is published to the world, and if given to one there is no good reason why any other, doing a lawful business, should be precluded from receiving it on equal terms. The quotations being valuable property and subject to sale, the ordinary rules regarding property apply. The title passes from the Exchange upon delivery and becomes vested in the Telegraph Company, and the Telegraph Company sends the quotations broadcast to brokers who immediately publish them to the world. They are beyond the

control of the Exchange immediately upon delivery to the Telegraph Company. It is true that the word "sale" is not used in the contract, but all the elements of a sale are present, delivery of valuable property, and the payment of the consideration price. There is nothing peculiarly secret or sacred in these quotations, and there is no substantial reason why they should be treated differently than any other kind of personal property. The Exchange might retain control by contracting directly with the brokers, and then would be entitled to limit the number of its agents. The quotations would be sent through the Telegraph Company by the same means as now, but there would be no reason why the Telegraph Company should pay anything; on the contrary, the Telegraph Company would be relieved of the payment of the sum now agreed to be paid and would receive full legal compensation for services rendered.

. The defendant contends that its position is sustained by In re Renville, 46 App. Div. 37, 61 N. Y. Supp. 549. In that case the court refused a mandamus to compel the Telegraph Company to furnish petitioner with quotations of the Exchange in the same manner as furnished to others. This decision was made in 1899, before telegraph companies were brought within the Public Service Commissions Law. It does not appear that the applicant in that case conformed to the reasonable rules and regulations, nor that the respondents were not acting within their rights in refusing the service. Under the Public Service Commissions Law these defendants are prohibited from charging, collecting, or receiving a different compensation for any service rendered than the charge applicable to such service as specified in its schedule on file and in effect, and from refunding or remitting directly or indirectly any portion of the rate or charge so specified. Article 5, § 92. The law also provides that every telegraph corporation shall print and file schedules showing "all rates, rentals, and charges per service of each and every kind."

The conclusion reached here does not conflict with the law of the Renville Case applied under then existing conditions. It appears in that case (46 App. Dig. 43, 61 N. Y. Supp. page 554) that:

"This private voluntary association [the Exchange], being thus in control of its own property, and having the absolute right to give information as to the dealings of its members with each other to whom it pleases, and upon such conditions as it pleases to impose, gives certain information to the defendants to be delivered to certain specified persons, and upon condition that the defendants give such information to such specified individuals and none other."

It appears that, by the agreement between the Exchange and the Telegraph Company then in force, the Telegraph Company has the right (46 App. Div. 41, 61 N. Y. Supp. 552)—

"to serve said reports to all persons, firms, corporations, and organizations in New York City and elsewhere, * * * except to persons who may be directly or indirectly engaged in the promotion or maintenance of 'bucket shops.' "

It thus appears that the purpose of the restrictions was to prevent the furnishing of quotations to bucket shops; that the Exchange retained control of its own property, and specified the person to whom

it should be delivered. It would seem that it would' be nearer correct if it stated the persons to whom it should not be delivered. In the present case the Exchange does not specify any persons whatever. It delivers the property for value to the Telegraph Company, with the only legal restriction that the Telegraph Company shall not specify any persons engaged in promoting bucket shops. The Telegraph Company has specified these plaintiffs, who are entitled to the presumption that they are not in the prohibited class; and, moreover, it is alleged, and not controverted, that they are not in the business of promoting bucket shops.

The provision of the Public Service Commissions Law is analogous to the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379), and decisions under the latter are instructive. In L. & N. R. R. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671, the railroad company, an interstate carrier, contracted with Mottley that, in consideration of a release of a claim for damages, it would issue annual passes for life to Mottley and his wife; subsequently the Interstate Commerce Act was passed, prohibiting different compensation for transportation than that specified in its published tariffs or rates, and the railroad company refused to furnish the passes. The court held that, while the contract for the passes was valid when made, by subsequent legislation such contract was unenforceable. So here, if a pre-existing contract, valid when made, is rendered unenforceable by the legislation, a contract to restrict the performance of the requirements of equal service is also unenforceable, and the quotations, once they are delivered to the Telegraph Company, are subject to the rule of equal service to all who conform to the reasonable regulations and pay the uniform charges.

[4] It is urged by defendants that, if plaintiffs have any right of complaint, their remedy is by application to the Public Service Commissions under section 97 of the law; but the citizen, whose private rights, capable of enforcement in the courts, are involved, are not confined to an application to the commission, when in the meantime his business is greatly, if not totally, interfered with, and the relief by injunction is the only remedy adequate to the situation.

The injunctions are continued until the hearing and determination of the actions.