HOLMES ELECTRIC PROTECTIVE COMPANY, Appellant, *v.* WILLIAM WILLIAMS, as Commissioner of Water Supply, Gas and Electricity of the City of New York, et al., Respondents.

Telegraph companies — eminent domain — validity of incorporation of electric protective company under " The Telegraph Act "— such company a public service corporation having right of eminent domain — right, under certificate of incorporation, to occupy streets of New York city without secondary franchise from municipal authorities.

1. Whether the use of the streets by a corporation is a public use, for which private property is authorized to be taken, will depend upon the object aimed at and whether the plan has such an obvious or recognized character of public utility as to justify the exercise of the right of eminent domain. It must be for the benefit and advantage of all the public and which all have a right to freely enter upon, under terms common to all. Public use necessarily implies the right of use by the public.

2. A company incorporated in 1883 under " The Telegraph Act " (L. 1848, ch. 265 and acts amendatory thereof), for the purpose of doing a general telegraph and electric protective business by means of automatic electrical alarms or signals transmitted to central offices, where watchmen are stationed to reply to such signals and render the services required thereby, is a telegraph company, within the purview of the act, as a corporation having a public utility in view as its purpose, which is, under the New York practice, a purpose for which the power of eminent domain may fitly be conferred. Such corporation is now recognized as a public service corporation regulated by article 9 of the Transportation Corporations Law (Cons. Laws, ch. 63) upon which are conferred, under appropriate conditions, the

right of eminent domain and also the right to use streets and highways; and is also a corporation recognized as a telegraph corporation and its operations regulated by the Public Service Commissions Law (Cons. Laws, ch. 48, art. 1, § 2, subd. 19, and art. 5).

3. Such corporation, being a telegraph company having a franchise from the state of New York pursuant to the act of its incorporation, has the right to maintain its signal lines over the streets in the city of New York, according to the routes mentioned in its charter and this privilege or franchise is not dependent upon the further consent of the city authorities. The state could grant the corporation such rights without the consent of the municipality. (*Matter of N. Y. Independent Telephone Co.*, 133 App. Div. 635; affd., 200 N. Y. 527, distinguished.)

*Holmes Electric Protective Co.* v. *Williams*, 181 App. Div. 687, reversed.

(Argued January 29, 1920; decided April 13, 1920.)

APPEAL, by permission, from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered April 8, 1918, unanimously affirming a judgment in favor of defendants entered · upon a dismissal of the complaint by the court on trial at Special Term.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Edward L. Blackman* and *Charles T. Russell* for appellant. Appellant obtained both a general and special franchise by incorporation under the Telegraph Acts and it was still in possession of those franchises in 1914 when this action was brought. (*People ex rel. Postal Tel. Co.* v. *State Board*, 224 N. Y. 167; *Village of Carthage* v. *C. N. Y. Tel. Co.*, 185 N. Y. 448; *Barhite* v. *Home Tel. Co.*, 50 App. Div. 25; *New Union Tel. Co.* v. *Marsh*, 96 App. Div. 122; *City of Rochester* v. *Bell Tel. Co.*, 52 App. Div. 6; *N. Y. Tel. Co.* v. *State*, 169 App. Div. 310; 218 N. Y. 738; *Wright* v. *Glen Tel. Co.*, 112 App. Div. 745; *State Line Tel. Co.* v. *Ellison*, 121 App. Div. 499; *Abbott* v. *City of Duluth*, 104 Fed. Rep. 833;

*Township of Summit* v. *N. Y. & N. J. Tel. Co.,* 57 N. J.
Eq. 123; *Michigan Tel. Co.* v. *City of Benton Harbor,*
121 Mich. 512; *City of Duluth* v. *Dul. Tel. Co.,* 84 Minn.
486; *New Hope Tel. Co.* v. *Concordia,* 81 Kan. 514;
*Chamberlain* v. *Iowa Tel. Co.,* 119 Ia. 619; *State* v. *Red
Lodge,* 30 Mont. 338.)   As appellant was lawfully oper-
·ating overhead in the streets of New York prior to the
enactment of the Electrical Subway Acts, the effect of
those acts upon appellant was to confer an unconditional
right to operate underground and, as to it, to modify
or waive all prior restrictions concerning underground
operations. (*People* v. *Kerr,* 27 N. Y. 188; *Milhau* v.
*Sharp,* 27 N. Y. 611; *Barhite* v. *Home Tel. Co.,* 50 App. Div.
25; *City of Rochester* v. *Bell Tel. Co.,* 52 App. Div. 6; *New
Union Tel. Co.* v. *Marsh,* 96 App. Div. 122; *Village of
Carthage* v. *Central N. Y. Tel. Co.,* 185 N. Y. 448; *Wright*
v. *Glen Tel. Co.,* 112 App. Div. 745; *State Line Tel. Co.* v.
*Ellison,* 121 App. Div. 499; *N. Y. C. & H. R. R. R. Co.*
v. *City of N. Y.,* 202 N. Y. 212; *People* v. *Tax Comrs.,*
203 N. Y. 119; *People* v. *N. Y. Railways Co.,* 217 N. Y.
310; *N. Y. Tel. Co.* v. *State,* 169 App. Div. 310; 218 N. Y.
738; *People ex rel. Postal Tel. Co.* v. *State ·Board of Tax
Comrs.,* 224 N. Y. 167.)   The levying and collecting of
taxes for many years assessed against appellant upon the
value of its special franchise to operate in the streets of
the city of New York estops denial of the existence of such
franchise. (*Fredonia* v. *Fredonia Gas Co.,* 169 App. Div.
690; *People ex rel. United Natural Gas Co.* v. *Priest,* 152
App. Div. 249; *Consolidated Gas Co.* v. *New York,* 157
Fed Rep. 849.)   Plaintiff is a public corporation and
within the objects of the Telegraph Acts and capable of
taking their benefits. (*Smith* v. *G. & S. Tel. Co.,* 42 Hun,
454; *Shepard* v. *G. & S. Tel. Co.,* 38 Hun, 338; *Pontico
Water Co.* v. *Bird,* 130 N. Y. 249; *Matter of Burns,* 155
N. Y. 23; *Consumers' Gas & E. Co.* v. *Congress S. Co.,* 61
Hun, 133; *Matter of E. Canada El. Co.,* 49 Misc. Rep. 565;
*Matter of Niagara L. & P. Co.,* 111 App. Div. 686; *Armour*

*Packing Co.* v. *Edison Co.*, 115 App. Div. 51; *Palmer* v. *Larchmont El. Co.*, 158 N. Y. 231; *Nash* v. *Page*, 50 Ky. 539.)

*George L. Ingraham* for New York Telephone Company et al., interveners. The plaintiff and the intervening appellants acquired a complete franchise granted by the state " to erect and construct from time to time the necessary fixtures for such lines of telegraphs upon, over or under any of the public roads, streets and highways " (L. 1853, ch. 471, § 2; *Beekman* v. *T. A. R. R. Co.*, 153 N. Y. 144.) The act of the commissioners appointed by the legislature, requiring this plaintiff to place its wires underground, was a recognition by the state of the right of the plaintiff and this intervening corporation to use the streets for the purpose for which they were incorporated, and that this corporation, having, under direct mandate of the state, removed its overhead wires and placed them in the subway, was entitled to use the subway for the wires without interference by the municipal authorities or by any private individual. (*People ex rel. N. Y. El. Lines Co.* v. *Squier*, 107 N. Y. 593; 145 U. S. 175; *Rochester L. & W. Co.* v. *City of Rochester*, 176 N. Y. 36; *People* v. *O'Brien*, 111 N. Y. 1; *Village of Pelham Manor* v. *N. R. Water Co.*, 143 N. Y. 532.) Plaintiff and the intervening companies are all telegraph companies within the meaning of the Telegraph Act. (*H. R. Tel. Co.* v. *W. T. & R. Co.*, 135 N. Y. 393; *DeGrauw* v. *L. I. R. R. Co.*, 43 App. Div. 502; 163 N. Y. 597; *Matter of Washington Street A. & P. R. Co.*, 115 N. Y. 442; *Matter of L. E. L. & Power Co.*, 117 App. Div. 80; *Eels* v. *A. N. Tel. Co.*, 143 N. Y. 133.) Electrical telegraph signal companies organized under the general acts of 1848 and 1853 have been recognized as telegraph companies by the legislature, public officials of the state and by the courts. (*Hirsch* v. *A. D. Tel. Co.*, 112 App. Div. 265; *C. & M. Tel. Co.* v. *Type Tel. Co.*, 131 Ill. App. 131; 236 Ill. 476; Jones on Tel. & Tel. Companies

[2d ed.], 955; 27 Am. & Eng. Ency. of Law [2d ed.], 1093, 1094; 1 Wyman on Public Service Corporations, 118; 1 Joyce on Electric Law [2d ed.], § 223; 4 Cook on Corporations [7th ed.], 4017; 1 DosPassos on Stock Brokers' & Stock Exchanges [2d ed.], 24, 25; Trickett on Boroughs, 503, § 394; *People ex rel. Williams* v. *Dayton,* 55 N. Y. 367; *City of New York* v. *New York City Ry. Co.,* 193 N. Y. 543.)

*Morgan J. O'Brien* and *Morgan J. O'Brien, Jr.,* for Stock Quotation Telegraph Company, intervener. The essential element of a telegraph or telephonic franchise is the right to string wires from point to point. The method or property to be used is incidental and may vary, and may be changed or limited by the state without destroying its property so long as the essential element remains. (*People ex rel. N. Y. El. Lines Co.* v. *Squier,* 107 N. Y. 593; *People ex rel. N. Y. El. Lines Co.* v. *Ellison,* 188 N. Y. 523; *Fifth Ave. Coach Co.* v. *City of New York,* 194 N. Y. 19; *City of New York* v. *Fulton St. R. R. Co.,* 59 Misc. Rep. 630; 130 App. Div. 791; *Matter of T. A. R. R. Co.,* 121 N. Y. 536.) The Telegraph Act of 1848, as amended in 1853, with the supplemental acts, gave to the plaintiff an essential and substantial franchise to use the public roads, streets and highways and the waters of the state, without any obligation or condition requiring a franchise consent from the local or municipal authorities. (*People* v. *Kerr,* 27 N. Y. 188; *Milhau* v. *Sharp,* 27 N. Y. 611; *Barhite* v. *Home Tel. Co.,* 50 App. Div. 25; *Potter* v. *Collis,* 156 N. Y. 16; *City of New York* v. *N. Y. M. Gas Co.,* 135 App. Div. 260; 207 N. Y. 647; *Village of Carthage* v. *Central N. Y. Tel. Co.,* 185 N. Y. 448; *N. Y. Tel. Co.* v. *State,* 169 App. Div. 310; 218 N. Y. 738.) The Telegraph Act has never required the obtaining of local or municipal consents to the erection of overhead wires (or for a period of over twenty years to the laying of underground wires). (*R. & L. O. W. Co.* v. *City of Rochester,* 176 N. Y. 36; *Pen-*

*sacola Tel. Co.* v. *W. U. Tel. Co.*, 96 U. S. 1; *W. U. Tel. Co.* v. *Massachusetts*, 125 U. S. 530; *W. U. Tel. Co.* v. *Richmond*, 224 U. S. 160; *People ex rel. P. T. Cable Co.* v. *Tax Comrs.*, 224 N. Y. 167; *Potter* v. *Collis*, 156 N. Y. 16; *City* v. *N. Y. Mutual Gas Co.*, 135 App. Div. 260; 207 N. Y. 647; L. 1860, ch. 10; *People* v. *Third Ave. R. R. Co.*, 45 Barb. 63; *St. Louis* v. *W. U. Tel. Co.*, 148 U. S. 92; 149 U. S. 465.)   Plaintiff is properly incorporated under the Telegraph Act.   (*People* v. *Met. Tel. & Tel. Co.*, 31 Hun, 596; *Gannett* v. *Independent Tel. Co.*, 55 Misc. Rep. 555; 185 N. Y. 448; Transportation Corporations Law, §§ 100, 101, 102; L. 1910, ch. 673; *Hirsch* v. *American District Tel. Co.*, 112 App. Div. 265; *Feiber* v. *Manhattan District Tel. Co.*, 22 Abb. [N. C.] 121; *American Dist. Tel. Co.* v. *Tax Comrs.*, 127 App. Div. 455; Joyce on Telegraphs & Telephones [2d ed.], § 767; *Tucker* v. *W. U. Tel. Co.*, 95 Misc. Rep. 287; *Smith* v. *Gold & Stock Tel. Co.*, 42 Hun, 454; *Stock Ticker Case*, Pub. Ser. Comm. Mass., Sept. 7, 1915; *Silverblatt* v. *Brooklyn Tel. & M. Co.*, 150 App. Div. 268; *Nirdlinger* v. *Am. Dist. Tel. Co.*, 245 Penn. St. 453; *People ex rel. Clement* v. *Walker*, 100 Misc. Rep. 569.)

*William P. Burr, Corporation Counsel* (*Vincent Victory* of counsel), for respondents.   The decision in *Matter of New York Independent Tel. Co.* is controlling on the point that appellant must have the consent of the local authorities of the municipality before placing its wires underground in the city streets.   (*Matter of New York Independent Tel. Co.*, 133 App. Div. 635; 200 N. Y. 527; *People ex rel. New York El. Lines Co.* v. *Squier*, 1 N. Y. S. R. 633; affd., 6 N. Y. S. R. 281; 14 Daly, 154; 107 N. Y. 593; 145 U. S. 175; *People ex rel. New York El. Lines Co.* v. *Ellison*, 51 Misc. Rep. 413; 115 App. Div. 254; 188 N. Y. 523; 214 U. S. 529; *Matter of New York El. Lines Co.* v. *Empire City Subway Co., Ltd.*, 69 Misc. Rep. 200; 140 App. Div. 934; *People ex rel. N. Y. El. Lines Co.* v. *Ellison*, 235 U. S. 179; *New York El. Lines Co.* v. *Gaynor*, N. Y. L. J.,

May 6, 1912; 167 App. Div. 314; 218 N. Y. 417.) Appellant's claim to have through its incorporation a franchise to use the streets of the city of New York for the construction and maintenance of its overhead wires is untenable. (*H. R. Tel. Co.* v. *Watervliet T. & R.·Co.*, 135 N. Y. 393; *People ex rel. C. P. Co.* v. *P. S. Comm.*, 226 N. Y. 527; *Albright* v. *Lafayette Building*, 102 Penn. St. 411; *Economic Power Co.* v. *City of .Buffalo*, 195 N. Y. 286; *Lord* v. *Eq. L. Assur. Society*, 194 N. Y. 212; *Ghee* v. *N. U. Gas Co.*, 158 N. Y. 510; *Simmons* v. *Maryland Tel. Co.*, 63 L. R. A. 727; *Plattsburgh* v. *People's Tel. Co.*, 88 Mo. App. 306; *Matter of New York Ind. Tel. Co.*, 133 App. Div. 635; 200 N. Y. 527; *Jamestown* v. *Home Tel. Co.*, 125 App. Div. 1.) Appellant did not secure a franchise to construct, use, maintain and operate "lines of electric telegraph" in the streets of the city through the command or direction of the subway laws or the board of commissioners of electrical subways or its successors. (*People ex rel. W. S. El. Co.* v. *Cons. Tel. & El. Co.*, 187 N. Y. 58.) The city is not estopped from denying the existence of appellant's franchise. (*Flatbush Gas Co.* v. *Coler*, 190 N. Y. 268; *Joline* v. *City of ·New York*, 148 App. Div. 890.) Plaintiff as part of this case must show that it has a valid overhead and underground franchise to construct, use, operate and maintain "lines of electric telegraph" in the streets of the city. (*Zanesville* v. *Gaslight Co.*, 47 Ohio St. 1; *People ex rel. Cayuga P. Corp.* v. *P. S. Comm.*, 226 N. Y. 527.)

CRANE, J.   The plaintiff was incorporated about January 29th, 1883, under the "Telegraph Act," chapter 265 of the Laws of 1848 and the various acts amendatory thereof. Immediately upon its incorporation it purchased the existing systems of overhead wires operated by the Holmes Burglar Alarm Telegraph Company and the American District Telegraph Company, which companies had theretofore conducted telegraph systems for

the detection of burglary in the city of New York.   The Holmes Burglar Alarm Telegraph Company had been a corporation formed under the " Manufacturing Act " (chapter 40, Laws of 1848) and the American District Telegraph Company was a corporation formed in 1871 under the provisions of the " Telegraph Act."

Previous to the year 1872 one Edward Holmes was conducting a business which consisted of the manufacture and sale of electrical alarm devices.   He instituted the " Central Office System of Burglar Alarm."   This system involved the connecting of premises to be protected with a signal station by means of electrical wires, which would register an alarm at the central office when interfered with.   These wires were run over housetops and over and along private property and across the public streets.   As an incident to this system watchmen were employed to patrol and inspect the protected premises and the apparatus connected therewith.   The basis of the system was the electrical telegraph.   A message was sent from the house, unlawfully opened, to a central office notifying it of the fact.   A mere signal was registered by electricity, but this signal was interpreted to mean that a door or window was opened without authority.   All telegraph messages are but electric signals having well-understood meanings.   A burglar telegraphed his entrance.   He sent his message over a wire.   That his act was involuntary and unconscious made it none the less a telegraph message.

In 1874 Edward Holmes incorporated under chapter 40 of the Laws of 1848 (known as the General Manufacturing Act) the Holmes Burglar Alarm Telegraph Company and transferred to it the central office system of electrical protection, patrol and the business of furnishing night watchmen.

The American District Telegraph was incorporated October 4th, 1871, under the " Telegraph Act " and thereafter engaged in part in a similar business to that of the Holmes Burglar Alarm Telegraph Company.

This plaintiff, as before stated incorporated in January of 1883, took over the business of the Holmes Burglar Alarm Telegraph Company and the burglar alarm business of the American District Telegraph Company.

The business conducted by the plaintiff under its charter consists in maintaining a number of so-called central offices in the boroughs of Manhattan and Brooklyn which are connected by wires with a number of business houses and residences in the vicinity of the central office. The protected premises are so arranged that if entry be made therein a telegraph message is recorded by the central station. In case of an authorized entry a code telegraph signal is used so that the central office is advised that the person entering the premises is not an intruder, but in the absence of such code signal the company assumes that every such message is caused by an intruder. The company maintains watchmen who reply to such signals and render special services.

In January of 1883 the plaintiff in taking over the above systems was furnishing its protective services to nine hundred and twenty-seven subscribers or customers and in January of 1884 the business had increased to nine hundred and ninety-seven subscribers or customers. The business thereafter continued to grow and increase, new lines, conductors and stations were added as required and at the time of this trial the plaintiff was operating about 4,500 miles of wire in the city of New York and serving upwards of 2,520 subscribers or customers.

Until 1891 the plaintiff maintained its wires overhead. In that year, pursuant to the requirements of the board of electrical control and the city of New York under the Electrical Subway Acts (chapter 534 of the Laws of 1884, as amended by chapter 429 of the Laws of 1885), the wires were put underground and have been there ever since.

Beginning with 1910 the city has questioned the right of the plaintiff to maintain its wires in the streets of New

York or in the electrical subway conduits, insisting that it has no franchise so to do. The city having threatened to remove the wires, this action was brought to restrain such interference. It has resulted thus far in the city's favor, the courts below holding that the plaintiff not having obtained from the city of New York a consent or franchise to use the streets or electric subways for its wires has no authority for the continuance of its business by this means except under the contract which it was forced to make with the city pending this litigation.

The sole question presented by this appeal is whether the plaintiff having incorporated under the " Telegraph Act " received thereby a franchise or authority from the state to maintain its wires and carry on its burglar alarm system as above described.

The act of 1848, chapter 265, as amended by chapter 471 of the Laws of 1853, provided that any number of persons might associate for the purpose of constructing a line of wires or telegraphs through the state or from or to any point in the state. The certificate of incorporation was to state the general route of the line of telegraph, designating the points to be connected.

Section 2 of chapter 471 of the Laws of 1853 read as follows: " Such association is authorized to erect and construct, from time to time, the necessary fixtures for such lines of telegraph, upon, over or under any of the public roads, streets, and highways; and through, across or under any of the waters within the limits of this state, * * * and also to erect and construct such fixtures upon, through or over any other land, subject to the right of the owner or owners thereof to full compensation for the same."

If agreement could not be made with the owners for compensation five commissioners were authorized to fix the amount.

The certificate of incorporation filed by the plaintiff stated its object to be to construct and maintain lines of

electric telegraph within and partly without the limits of the state of New York.

The route of its lines was stated to be from a main office in the vicinity of the Stock Exchange in the city of New York, to and with points in said city where branch offices of the said association may be established and from such offices along, across, over and under streets and avenues, and over buildings in said city and to and into buildings therein so as to connect such buildings with the offices of the association and to connect all such offices with each other. All this was for the purpose of protecting said buildings together with their contents against burglary and fire.

Read strictly the " Telegraph Act " of 1848 might seem to apply solely to telegraph companies as understood at the present time, but such has not been the interpretation given by the courts or the public officers and departments dealing with companies and associations incorporated under the act. It certainly could not have applied to telephone companies as such were not known or in existence in 1848. And yet when the telephone was perfected so as to transmit the human voice and companies were formed to enable persons at distances to talk with each other, the " Telegraph Act " was held to be the authority for such incorporation. (*Hudson River Telephone Co.* v. *Watervliet Turnpike & Railway Co.,* 135 N. Y. 393; *People* v. *Metropolitan Telephone & Telegraph Co.,* 31 Hun, 596.) District messenger companies requiring wires for calling officers or messengers were recognized by the courts as corporations organized under this law of 1848. (*Hirsch* v. *American District Telegraph Co.,* 112 App. Div. 265; *American District Telegraph Co.* v. *Woodbury,* 127 App. Div. 455.) Auxiliary fire alarm companies supplementing the fire alarm telegraph system in cities by connecting the subscribers' buildings with central stations so that telegraphic communications respect-

27

ing fires could be transmitted from the building itself to the central office have been recognized and specifically referred to by section 729 of the Greater New York charter. Companies to transmit stock quotations by telegraph and incorporated as telegraph companies have been before the courts unquestioned as to their powers. (*Tucker* v. *Western Union Telegraph Co.*, 95 Misc. Rep. 287; affd., 156 N. Y. Supp. 1148; *Smith* v. *Gold & Stock Telegraph Co.*, 42 Hun, 454.)

The provisions of the act of 1848 and its amendments have found their way into article IX of the Transportation Corporations Law. (Cons. Laws, ch. 63.) Section 105 of that law indicates that the legislature recognized that burglar alarm companies like the plaintiff were not only performing a public service but were existing as legalized corporations maintaining wires and electrical systems for signaling. This section provides that the police department may appoint a number of persons, not exceeding two hundred, who may be designated by any corporation operating a system of signaling by telegraph to a central office for police assistance to act as special patrolmen in connection with such telegraphic system.

While this later enactment of the legislature and the above cases may not be conclusive of an intention on the part of the legislature of 1848 to include such companies as the plaintiff in the category of telegraph companies, yet such recognition and treatment on the part of officers of the government are of considerable weight in interpreting a general act such as that here in question. (*Matter of Washington Street Asylum & Park Railroad Company*, 115 N. Y. 442.)

The city itself has recognized the plaintiff's existence; at various times its officers and departments have contracted with the plaintiff for burglar alarm devices of the character herein described. For twenty-seven years the plaintiff has operated in New York city its burglar alarm system and at great expense removed its overhead wires

to the underground conduits under the direction and control of the authorities.

During the period from and including the year 1900 there have been levied against the plaintiff under the New York statute, each year, special franchise assessments for large sums, based upon the value of its supposed franchise, for the use of the streets and highways of said city of New York, including therein the value of the plaintiff's property in, upon, under and above the streets and the right to use said streets and highways for the purposes of its business, which special franchise taxes have been regularly paid annually by the plaintiff to the proper authorities of the city of New York, amounting in all to $57,225.00.

By the Electrical Subway statute of 1885 it was provided that the amount of the salaries of the subway commissioners and their expenses should be by the state comptroller assessed upon and collected from the several companies operating electrical conductors, which under the provisions of said act should be required to place and operate any of their conductors underground, ratably, according to the number of miles of such wires, the amount thus assessed to be paid by the company assessed, and the plaintiff paid and said state comptroller collected from plaintiff for each of the seven years from 1891 to 1897 inclusive, and during each of the years 1892 to 1898 inclusive various sums, amounting in all to the sum of $2,507.83 for the territory included in the borough of Manhattan and the sum of $40.40 for the territory included in the borough of Brooklyn as and for its share of said salaries and expenses.

Permits were constantly issued to the plaintiff by the city department in control to open the streets and subways to insert its wires.

These acts establish no estoppel as against the city, but they do indicate that a practical interpretation has been given to the " Telegraph Act " and to the incorporation of this plaintiff under it and that the rights of the plaintiff

in the streets derived from that act have been assumed, recognized and acted upon. General incorporation acts have usually been given a sufficiently broad interpretation to meet progressive inventions in the enterprises mentioned. (*De Grauw* v. *Long Island Electric Railway Co.,* 43 App. Div. 502; affd., 163 N. Y. 597; *Matter of Washington Street Asylum & Park Railroad Co., supra.*)

The Special Term found that the plaintiff was not a telegraph company or properly incorporated under the " Telegraph Act." This finding was reversed by the Appellate Division which determined that the plaintiff was a telegraph company but that it required a secondary franchise from the city of New York.

It seems quite evident that in view of the interpretation and construction heretofore given to the act of 1848, as amended, the plaintiff was duly incorporated under that act and obtained all its privileges and assumed all its responsibilities. Among these privileges was the right to maintain its signal lines over the streets in the city of New York according to the routes mentioned in its charter and that this privilege or franchise was not dependent upon the consent of the city authorities. We must not read the act of 1848 in the light of the experiences of the next half century. No doubt upon its face it is very liberal in affording rights in the city streets, but the scientific development of that day and civic conditions were such that the privileges were used to a very limited extent and resulted in little or no abuse before restricted and modified by subsequent laws. The state had full control over the streets of the city of New York and could grant the plaintiff without the consent of the municipality such rights as here are claimed. (*Village of Carthage* v. *Central N. Y. Tel. & Tel. Co.,* 185 N. Y. 448; *Rochester & L. O. W. Co.* v. *City of Rochester,* 176 N. Y. 36.)

We are convinced that the Appellate Division was right in its conclusion that the plaintiff is a telegraph company and had a franchise from the state of New York pursuant

to the act of its incorporation, but we cannot follow the Appellate Division to the extent of holding that a secondary franchise from the city was also requisite. It was thought that chapter 397 of the Laws of 1879, as amended by chapter 483 of the Laws of 1881, in existence at the time of the plaintiff's incorporation, required it to obtain the consent of the city authorities to the removal of its lines to the underground conduits. These laws authorized companies such as the plaintiff to construct and lay lines of electrical conductors underground in any city provided the permission of the designated local authorities be first obtained. These acts were permissive and not compulsory. The plaintiff never exercised the right or asked permission to go underground.

Chapter 534 of the Laws of 1884, as amended by chapter 529 of the Laws of 1885, was the first compulsory law requiring overhead lines to be put underground in cities of over 500,000 inhabitants.

In pursuance of said statutes boards of commissioners of electrical subways were duly appointed and organized in the year 1885 and adopted plans for a complete system of electrical subways in the borough of Manhattan. These were constructed and put into operation and are now in use throughout the said borough maintained and operated by the defendant Empire City Subway Company, Limited. The said commissioners of electrical subways were afterwards replaced and superseded by boards of electrical control which were in turn replaced and superseded by the commissioner of public buildings, lighting and supplies. The last official was in 1901 replaced and superseded in control and supervision of the subways by the commissioner of water supply, gas and electricity which office is now held by the defendant, William Williams.

Pursuant to the authority conferred upon the commissioners of electrical subways and their successors the plaintiff has been required to place certain of its wires

underground in the electrical subways and to remove its overhead wires and appurtenances for that purpose. The plaintiff has complied with all these orders at a considerable expense. Its acts were not voluntary but in obedience to the statutes and authorities established thereunder.

The consent of the city authorities was not necessary to do that which the law commanded.

If the plaintiff's wires are now in the subway conduits it is by the direction of the municiapl authorities or of boards established by the legislature in the exercise of its regulatory powers over streets and highways. (*People ex rel. N. Y. Elec. Lines Co.* v. *Squire,* 107 N. Y. 593; affd., 145 U. S. 175.)

The position of the plaintiff is dependent upon its incorporation and the exercise of corporate powers under the " Telegraph Act " and *prior* to the requirements of the electrical subway acts beginning in 1884. Any company incorporated after 1884 would, of course, be obliged to comply with the subway act provisions, obtain the consent of the municipality and, since the adoption of the charter of the city of New York, comply with sections 73 and 74 thereof. It is upon this view of the law that *Matter of New York Independent Telephone Co.* (133 App. Div. 635; affd., 200 N. Y. 527) was decided. That company and its predecessor, the Mercantile Safe Deposit Company, were incorporated after the passage of the subway acts. No overhead wires could be hung at the time of incorporation. The Independent Telephone Company had no rights in the streets prior to 1884 and necessarily was obliged to obtain the consent of the local authorities to the placing of its wires underground. But such ruling would not apply to companies owning and exercising overhead franchises prior to 1884 and complying with the positive direction of the legislature to place the wires underground.

Whatever may have been the claim of the plaintiff as to the nature of its franchise in the streets when questioned in tax proceedings it must necessarily admit by reason of

its present claim and position that its business is of a public nature; that if it has the right to a franchise in the streets by reason of the Telegraph Acts it is not solely for private purposes, and that while it may make special contracts with its customers and patrons in the absence of legislative regulation yet its business like that of other service corporations is subject to legislative control.

For reasons here expressed the judgment appealed from should be reversed and a new trial granted, with costs to abide the event.

ANDREWS, J. (concurring). The plaintiff was a telegraph company and properly incorporated under the act. If so, the legislature certainly intended to confer upon it and upon all other corporations not specifically excepted, likewise so incorporated, the right of eminent domain and a franchise in the streets. If it succeeded we must reverse the judgment appealed from.

The legislature may delegate the right of eminent domain only where the particular property to be taken is to be devoted to a public use. (*Matter of Niagara Falls & W. Ry. Co.*, 108 N. Y. 375; *Matter of Tuthill,* 163 N. Y. 133; *Matter of Deansville Cemetery Assoc.*, 66 N. Y. 569; *Matter of Mayor, etc., of N. Y.*, 135 N. Y. 253.) The same rule applies as to franchises in highways where the use contemplated is inconsistent with ordinary highway purposes. (*City of N. Y. v. Rice*, 198 N. Y. 124; *Fanning v. Osborne*, 102 N. Y. 441; *Bradley v. Degnon Contracting Co.*, 224 N. Y. 60.) The question as to whether a proposed use is in fact public is for the determination of the courts. In this case the validity of the grant of eminent domain and of the franchise are so related that both exist or neither.

Is the use of the streets by the defendant a public use? " Whether that is a public use, for which private property is authorized to be taken, will depend upon the object aimed at and whether the plan has such an obvious, or

recognized, character of public utility, as to justify the exercise of the right of eminent domain." (*Matter of Tuthill*, 163 N. Y. 133, 139.)   " It must be for the benefit and advantage of all the public and in which all have a right to share — a use which the public have a right to freely enter upon under terms common to all.   Public use necessarily implies the right of use by the public." (*Bradley* v. *Degnon Contracting Co.*, 224 N. Y. 60, 71.)   These definitions were not intended to be exhaustive but from them it may be deduced that the object for which the grant is made must have public utility, must be one in which the public has a right to share impartially and one generally recognized by the settled practice as a fit purpose for the exercise of the power of condemnation. (*Clark* v. *Nash*, 198 U. S. 361.)   Because of the last clause, eminent domain could not be conferred upon one desiring to build an inn.

Without, however, attempting to find a general rule as to what is or what is not a public use it may be said that the object of this particular grant to the plaintiff has public utility in view and that it is under the New York practice a purpose for which the power of eminent domain may fitly be conferred.   The use does have a public aspect.   By it the public policy of the state is served.   It assists in the preservation of law and order. And it is the kind of purpose for which we are accustomed to permit the exercise of the right — the stringing of wires over which messages are to pass.   Must the plaintiff, however, serve the public impartially on demand? I think it must do so.

In the last revision of the statutes, the purpose of the legislature is indicated.   Corporations are either (1) moneyed corporations, (2) railroad or other transportation corporations, or (3) business corporations.   The plaintiff comes under the second class.   In that class it is regulated by article nine of the Transportation Corporations Law, because the legislature intended to include it by its

reference to lines of electric telegraph. This law was intended to group together public service corporations and where appropriate the right of eminent domain was conferred upon such as came under it and also the right to use streets and highways.

As to such corporations further regulations are imposed by the Public Service Commissions Law. This law defines a telegraph corporation (sec. 2, subd. 19) and regulates its operations (art. 5). If in the transportation act the reference to telegraph corporations includes the plaintiff there can be no reason why the same words here used do not also include it. If so it is required to provide impartial service at reasonable rates on demand subject to the supervision of the commission and other governmental regulations are imposed upon it.

I concur with the prevailing opinion that the judgment appealed from should be reversed.

POUND, J. (dissenting.)    Plaintiff was incorporated on the 29th day of January, 1883, " for the purpose of doing a general telegraph and electric protection business " under the provisions of chapter 265 of the Laws of 1848, entitled, " An act to provide for the incorporation and regulation of telegraph companies " and acts amendatory thereof and supplemental thereto, which provide that persons may associate themselves for the purpose of " constructing a line of wires of telegraph." The act provides (§ 5) that telegraph companies may " construct lines of telegraph along and upon any of the public roads and highways," and (§ 6) take private lands therefor on making compensation. The general route of the " telegraph and protective line or lines " of plaintiff was stated in the certificate of incorporation as follows:

" From a main office in the vicinity of the Stock Exchange in the City of New York, State of New York, to and with points in said city where branch offices of the said Association may be established, and from such

offices along, across, over and under streets and avenues, and over buildings in said city and to and into buildings therein, so as to connect such buildings with the offices of the Association and to connect all such offices with each other. And also from said office to a main office in the city of Jersey City, New Jersey, and other cities and towns in the State of New York, New Jersey and in other of the United States, or from such main office in such other cities and towns to other points in said cities and towns so as to connect buildings with said offices of the association in each of said cities and towns for the purpose of protecting said buildings, together with their contents, against burglary and fire and for doing a general telegraphic business."

From the time of its incorporation in 1883 down to the present time the plaintiff has been and is engaged in the business of furnishing protection from burglary to banks, banking institutions, mercantile establishments, stores, residences and other buildings and premises occupied by plaintiff's customers or subscribers in the boroughs of Manhattan and Brooklyn of the city of New York. Such service was and is performed principally by means of electric signals, devices and appliances, operated by electric wires and conductors extending and radiating from various stations and central offices located in different parts of the said boroughs. Such wires and conductors originally were overhead wires and conductors crossing the streets in both boroughs from roof to roof, and the operation of such overhead wires continued until the year 1891, when they began gradually to be replaced by underground or subway wires laid in subways under the streets of the borough of Manhattan in pursuance of the subway statutes hereinafter referred to. At the time of the beginning of this action the greater part of the plaintiff's wires and conductors in Manhattan had been placed and were being operated underground, in such subways. In the borough

of Brooklyn the plaintiff has been leasing and using the subway wires of the New York Telephone Company since the installation of the subway system in said borough.

Plaintiff does not receive and transmit dispatches for the public generally, nor between different offices. It operates an alarm system for its customers, to protect them from burglary, by communicating, automatically, signals to a central office when doors or windows are opened by intruders. It has a system of private patrol and night watch business in connection with the burglar alarm. When an alarm comes in, plaintiff sends its watchman to the premises. Without the watchmen, the alarm would be useless. The telegraphic signals are means to an end.

Plaintiff succeeds the Holmes Burglar Alarm Telegraph Company and the American District Telegraph Company. It has about 4,500 miles of wire in the city of New York and serves about 2,500 subscribers. Its property is worth about $1,000,000. Neither it nor either of its predecessors has any special franchises from the city of New York to operate its lines in the city, or to place its wires underground.

The defendants are the city of New York and certain of its agencies having charge of the streets and having the power to grant franchises in such streets, and also the Empire City Subway Company, Limited, which controls the telephone and telegraph subways in the borough of Manhattan. The plaintiff contends that by virtue of its incorporation as a telegraph company it has a franchise from the state which authorizes it to use the city streets and subways for electrical conductors without interference from the local authorities. (L. 1853, ch. 471, § 2.) The defendants contend that the plaintiff is not a telegraph company which is organized for public purposes; that it is engaged in a private business, and that, as such private company, has no right to occupy the city streets without the consent of the city.

The plaintiff asks judgment to the effect that it has a valid franchise to construct, maintain and operate its electrical conductors in the streets of the city and that the city be enjoined from interfering with such rights, and from exacting any sum as a condition for granting a special franchise.

From a judgment of the Trial Term, dismissing its complaint, affirmed by the Appellate Division, it appeals with permission granted by this court.

The subway laws applicable to the city of New York (L. 1884, ch. 534; L. 1885, ch. 499; L. 1887, ch. 716; L. 1891, ch. 231) provide for placing underground the electrical conductors which were previously strung on poles in the streets and elsewhere, and require all " duly authorized " companies operating such conductors in the streets of the city to place their electrical wires and cables underground. Laws of 1892, ch. 263, and the Greater New York charter make it unlawful for companies to place their electrical conductors underground without authority from the city. Before plaintiff placed its wires in the subway, it ran them over housetops and over and along private property and made no material use of the streets, except as streets were crossed by wires running from housetop to housetop.

The trial court decided that the business of the plaintiff was not that of a telegraph company because it did not receive messages or communications between individuals or others and transmit them from one place to another as is usually done by companies doing a general telegraph business, and, for that reason, it had not a valid franchise to use the city streets. The Appellate Division held that the plaintiff was a telegraph company; that its rights to exercise its state franchise to occupy the city streets could not be questioned in this case because the People of the State of New York are not a party hereto, but that it was not entitled to maintain its action because it had no special or secondary franchise from the city of New York.

Assuming, as we safely may, for the purposes of this controversy, that the plaintiff was duly incorporated, did it, by such incorporation, acquire a franchise to operate its wires over or under the streets of the city of New York without the permission of the municipal authorities? The answer depends primarily on its ability to establish its status as a public service corporation. Herein it encounters no small difficulty, by reason of the vague resemblance which it bears to telegraph companies doing a general telegraphic business. Such companies form one of a great class of public callings. They transmit messages from place to place through the medium of an electric current passing over extended wires. They receive dispatches from or for any individual and transmit the same with impartiality in the order in which they are received. (Transportation Corporations Law, § 103.) They " put a girdle about the earth " with their connections. They are, like railroads, termed a " powerful agency of commerce " and as such protected by the power of Congress from hostile state legislation when they cross state lines. " No state legislation shall prevent the occupation of post roads for telegraph purposes by such corporations as are willing to avail themselves " of the act of Congress. (*Pensacola Tel. Co.* v. *Western Union Tel. Co.*, 96 U. S. 1, 11.) The state of New York has given them (L. 1848, ch. 265, § 5) the right to construct and maintain their lines over all public roads, streets or highways when the fee is in the municipality and to construct their lines over any other highways or lands, subject to the right of the owner to compensation. This right comes directly from the state and not from or through the local authorities. (*Eels* v. *Am. T. & T. Co.*, 143 N. Y. 133; *Village of Carthage* v. *Central New York Telephone & Tel. Co.*, 185 N. Y. 448.) The grant of authority to occupy public streets and public highways, included in the act of incorporation, constitutes a special franchise grant, direct from the state to the corporation

with which the locality may not interfere. (*People ex rel. Postal Tel.-Cable Co.* v. *State Board of Tax Comrs.*, 224 N. Y. 167.) Such is their primary franchise under the Transportation Corporations Law and the prior statutes, but other, different or greater rights in the construction, maintenance and operation of their lines may be, and often are, sought and obtained by such companies from the political subdivisions of the state. (*Rochester Telephone Co.* v. *Ross*, 195 N. Y. 429.)

When the question of placing wires underground first arose, it seems to have been assumed that a telegraph company had no right to open the streets for that purpose. (*Missouri ex rel. Laclede Gas Light Co.* v. *Murphy*, 170 U. S. 78, 99.) The state legislature, when it specifically authorized and permitted the companies to put their electrical conductors under the surface, taking notice of the inconvenience that would result from unrestrained action, free from supervision by the localities, required that the consent of the local authorities be first obtained. (L. 1881, ch. 483, amending L. 1878, ch. 397, § 1.) It was held in *Matter of New York Independent Telephone Co.* (133 App. Div. 635; affirmed on opinion of Clarke, J., below, 200 N. Y. 527) that the consent of the local authorities was necessary in order to authorize that company to lay its wires underground in the city. The *Independent Telephone Company* case has been misunderstood because the statement in the opinion, in connection with L. 1881, ch. 483 (*supra*), that the statute required all telegraph and telephone companies to have the consent of the local authorities when they sought to occupy the streets under the surface, is coupled with the inadvertent suggestion that the decision in the *Carthage Case* (*supra*) might have been different if the provisions of that statute had been brought to the attention of the court. The cases were wholly dissimilar. The village of Carthage unsuccessfully sought to compel the Central New York Telephone Company to put its wires underground. It was

held that the state had not delegated the requisite power
to the village.   The Independent Telephone Company
sought the right to use the city streets without a franchise.
It was held that a secondary franchise was essential.
The company had acquired no operating rights from its
own incorporation in 1905, because it was organized sub-
sequent to the enactment of sections 71–73 of the city
charter (L. 1897, ch. 378, as amended), which required
a special and limited franchise from the city for the use of
the streets.   The decision in the *Carthage* case could not
have been affected in the slightest degree if the act of
1881, above referred to, had been brought to the atten-
tion of the court, for the statute had no bearing on the
question of the power of the village to compel the com-
pany to put its wires underground.   The state at all
times may impose additional burdens upon ·new com-
panies as conditions of incorporation; burdens from which
the older companies have been exempt; but it cannot
thereby take the property of such older companies from
them.   (*People* v. *O'Brien*, 111 N. Y. 1.)   It may tell the
latter where in the streets to place their wires, but it may
not put them off the streets .entirely, without compensa-
tion for the right appropriated, after it has once validly
granted the right and the right has been exercised in
reliance on the franchise.   (*City of Los Angeles* v. *Los
Angeles Gas & Electric Corp.*, 251 U. S. 32.)   If a general
telegraph company had been in lawful occupation of the
streets of the city of New York before the passage of the
subway acts and the sections of the city charter referred to,
the state could regulate the exercise of its franchise, and in
the public interest could require it to remove its wires from
one portion of the street to another, and require it to remove
its wires from overhead to underground (*N. Y. Telephone
Co.* v. *State of New York*, 169 App. Div. 310; affirmed,
218 N. Y. 738), but it could not be compelled to obtain a
special franchise from the city of New York in order to place
its wires underground, merely because the state required

that overhead wires should be taken out of the streets. The right is one thing, the regulation of the right is another. If plaintiff, of its own initiative, had sought the privilege of placing its wires underground, the consent of the local authorities to open the streets would have been necessary, but when the state intervened and required the companies to place their wires underground, it did not, and indeed could not, interfere with existing franchise rights, or impair the franchise contract which it had made.

The constitutional guaranty against the impairment of contracts by state legislation is not violated by the exercise of the police power providing for underground wires. (*People ex rel. N. Y. Electric Lines Co.* v. *Squire*, 145 U. S. 175.) The subway acts merely provided an agency by which the supervising power of the state was to be exercised. They repealed no valid existing franchise, nor did they delegate to the city the power to withhold its consent from any company previously having and exercising the right to occupy the streets, to put its wires in the subway. " The scheme of these statutes was not to annul or destroy the contract rights of such companies, but to regulate and control their exercise. They did not purport to deny them any privileges theretofore granted." (*People ex rel. N. Y. Electric Lines Co.* v. *Squire*, 107 N. Y. 593, 604.) Given a duly incorporated telegraph company, incorporated for public purposes and serving the public in commercial and personal transactions and governmental business, having lawful power to operate electrical conductors in the streets and exercising such power, the state becomes supreme and the localities are not permitted to interfere, except so far as the state itself authorizes the regulation of such companies in the exercise of their state franchises or the localities grant additional privileges to them. The case before us is to be considered, not as one where the plaintiff, of its own volition, seeks the privilege of placing its wires underground and so must obtain the

consent of the local authorities in order to do so, but as a case where the state itself, in the exercise of its police power to regulate its own franchise, requires the companies, lawfully occupying the streets with their overhead wires, to take them off the streets and place them underground.

Such being the rights, generally speaking, of telegraph companies following a public calling, then if plaintiff is such a company and has acted upon such a franchise, it has a right to its place in the subways, without municipal consent or interference (*People ex rel. N. Y. Electric Lines Co. v. Ellison*, 188 N. Y. 523) except by the way of reasonable regulations, duly authorized.

But it is the duty of the court to inquire into the nature of plaintiff's business and its claims for consideration as a public service corporation. If plaintiff is not a public service corporation, the state has granted it no rights to interfere with the primary purposes of the highway by erecting poles and stringing wires in city streets. Its presently asserted right to place its wires in the electrical subways rests upon its right thus to occupy the streets. The question of a direct and limited grant of subsurface rights only is not involved in this decision.

The reason why such sweeping powers are given to the telegraph companies is that they are not private enterprises, but are engaged in an undertaking which justifies the state in conferring upon them, as public service corporations, the right of eminent domain and the right to occupy the public highways of the state without the consent of the local authorities. A telegraph company, public in the nature of its duties, a common carrier of intelligence, receiving, transmitting and delivering messages from and to points far and near, is compelled to serve the public without discrimination in return for the unusual powers conferred upon it by the state.

28

The city cannot be denied the right to question the authority of the plaintiff to occupy its streets merely because the state does not challenge the exercise of such authority.   That is settled by *Matter of Niagara Falls & Whirlpool Ry. Co.* (108 N. Y. 375, 384), where it was held that a company incorporated under the General Railroad Law, seeking to take property of DeVeaux College *in invitum* for the purpose of its railroad, which was a scenic railroad but not a public highway in the sense that it transported persons or property over a road between certain termini, must show not only a legislative warrant, but also that the business which it was organized to carry on was public and that the taking of private property for its purposes was a taking for a public use; that the question as to whether the uses were in fact public so as to justify such taking is a judicial one to be determined by the courts on the objection of the landowner whose property it seeks to condemn.   Although it contemplated the building of a railroad upon which all who desired might ride, ANDREWS, J., said: " The inquiry is not precluded because the petitioner has organized itself under the General Railroad Act and has assumed in its articles of association the character of an ordinary railroad corporation." In *Bradley* v. *Degnon Contracting Co.* (224 N. Y. 60) it was again held that the question whether a particular use of a public highway is a public use is for the ultimate decision of the courts. The question arose in that case between lot owners on Seventy-ninth street and a contractor who constructed a railroad or tramway in the street to be operated in connection with its subway building contract, under the Rapid Transit Act and with the consent of the public service commission and the municipal authorities.   It was held that the construction and operation of the tramway was not a public use.

Plaintiff, in objecting to a special franchise tax assessed against it, has not maintained that it is a public service

corporation. It stated in its report to the state board of tax commissioners that it did not operate any telegraph or telephone wires or lines; did not perform any public service; did not receive nor transmit messages, persons or property, or anything else for hire; is not a common carrier or a public service corporation; that its business is the furnishing of protection to those special persons with whom it may make contracts, and in each case it makes a special contract with the persons or corporations whose property it undertakes to protect. While this statement is not conclusive, it is at least pertinent.

The conclusion that plaintiff is not a public service corporation flows naturally from the facts found. If it has the right to occupy the public streets, it also has the right of eminent domain. (L. 1848, ch. 265, as amended.) These two great rights are conjoined. They are intended to accompany one another. If it can be said that, as originally organized, it was authorized in part to do " a general telegraphic business," it does not assert such rights and may not enjoy the concomitant privileges. A corporation carrying on a private business cannot exercise the privileges of one organized for a public purpose when it does not perform the duty of serving the public, which " goes hand in hand with the privilege of exercising a special franchise  *  *  *  by the occupation of the public highways." (*People ex rel. Cayuga Power Corp.* v. *Public Service Comm.*, 226 N. Y. 527, 532.) This burglar alarm company, transmitting signals by electricity from its customers to it and sending out its watchmen in response; organized for private gain only and serving the interests of its stockholders and customers only, may not assert that it is a corporation exercising the high and unusual privileges of a general telegraph company — the right of eminent domain and the right to occupy the public highways. Can it be presumed to have been the legislative intent to permit

as many private companies as saw fit to organize under the General Telegraph Act to take private property by condemnation proceedings and to occupy the city streets with their overhead wires without limit as to number, so long as some principle of the electric telegraph was utilized by them in transmitting calls or signals? (*City of Toledo* v. *W. U. Tel. Co.*, 107 Fed. Rep. 10, 14.) We are not compelled so to construe the statute, nor should we, except when the legislative intent is unequivocal.

The ruling of this court which permitted telephone companies to organize under the Telegraph Act, although when the act was passed telephonic communication was unknown (*Hudson R. Tel. Co.* v. *W. T. & R. Co.*, 135 N. Y. 393), and although, in a strict sense, telephone companies do not receive, transmit and deliver messages for others, is inconsistent with so liberal a construction of plaintiff's articles of incorporation as is here claimed. A telephone line is a public utility. Telephones are " public vehicles of intelligence and they who own or control them can no more refuse to perform impartially the functions which they have assumed to discharge than a railroad company, as a common carrier, can rightfully refuse to perform its duty to the public." (*Chesapeake & P. Tel. Co.* v. *Balt. & O. Tel. Co.*, 66 Md. 399, 414.) Judge VANN, in *N. Y. Tel. Co.* v. *Siegel-Cooper Co.* (202 N. Y. 502) groups telephone companies with " common carriers and others engaged in serving the public," and says that the same principles apply to all public service corporations as to common carriers only. Telegraph and telephone lines and railroads are the great public utilities of the land, but not every telegraph or telephone or railroad system is a public utility. They become such only as they undertake to execute a public purpose like that of the common carrier, and even the telephone companies could not take advantage of the Post Roads Act of Congress because the privilege was extended only to telegraph companies which transmitted written messages,

and thus rendered a service " closely analogous to the United States mail service." (*Richmond* v. *Southern Bell Tel. & Tel. Co.,* 174 U. S. 761, 775.)

Plaintiff is organized under chapter 265 of the Laws of 1848, and has a legal existence, as a *de facto* corporation, at least, until the state directly questions its corporate existence or its corporate purpose. But, as a company organized under the Railroad Law which declares in its certificate of incorporation a purpose which is essentially private in its character, cannot claim that because it is organized under the Railroad Law it may exercise the power of eminent domain (*Matter of Niagara Falls & Whirlpool R. Co., supra*) so plaintiff's attempted assertion of powers adverse to the public may be questioned by any one against whom it may seek to exercise them.

It is urged that plaintiff has acquired from the state the right to occupy the streets for its purposes, even though they are not public purposes. Plaintiff, as we have said, acquired no subsurface rights by its incorporation (*Missouri ex. rel. Laclede Gas Light Co. v. Murphy,* 170 U. S. 78, 99). Its existing subsurface rights, if any, grew out of such rights as it thereby obtained to obstruct the surface of the city streets with its poles and wires. The right to occupy the public streets for a private business, not inconsistent with the public use, while not favored and often condemned even when expressly authorized, is sometimes recognized. (*Hatfield* v. *Straus,* 189 N. Y. 208, 222; *Fifth Avenue Coach Co.* v. *City of New York,* 194 N. Y. 19.) But a privilege seriously to obstruct the streets for such a purpose will never be upheld. The number of poles and wires erected in the streets by public service companies, increased to such an extent that, although lawful for a time, they became a public and private nuisance (*People ex rel. N. Y. Electric Lines Co.* v. *Ellison,* 188 N. Y. 523, 528), and the state ordered the wires underground in order to promote the public safety and convenience. It should not be

assumed that the legislature intended to grant to private companies even a street use which would thus interfere with general business and the operation of the fire department and other departments of the city. No implication of such a grant to plaintiff necessarily arises from section 105 of the Transportation Corporations Law which authorizes the appointment of special policemen "who may be designated by any corporation operating a system of signaling by telegraph to a central office for police assistance." The intention of the legislature to grant the use of city streets to private companies like plaintiff should be definitely expressed and not sought in vague and ambiguous language. The section cited may well be said to sanction the organization of plaintiff under the Telegraph Act of 1848, but it still remains for this court to say whether it thereby acquired or could acquire the privilege of obstructing the streets of the cities of the state with its poles and wires, without the consent of the local authorities.

It is urged that the act of the commissioners of electrical control requiring plaintiff to place its wires underground amounts to a grant of authority from the state which cannot be questioned by the city. This contention cannot consistently prevail. The commissioners had no power to compel any company to put its wires underground which did not have authority to occupy the streets. They had no power to determine whether plaintiff's use of the streets was for a public purpose. They had no power to grant the use of the streets for other than public purposes. Property rights are not thus vested in individuals or corporations by the unauthorized acts of public officials. When the first subway law went into effect on June 14, 1884, plaintiff had exercised no street franchise, except as its wires may have crossed a street, from housetop to housetop. In fact it had no street franchise and had claimed none. No officer or board having power to grant a franchise has ever acted

so as to induce plaintiff to assume that it had obtained
·such a franchise.   Because plaintiff has asserted rights
which have not been inquired into by the proper local
authorities; because it has been ordered into the subway;
because it has been assessed by the state board of tax
commissioners on a special franchise and has paid taxes
of which the city has had the benefit, it may not take
advantage of an unwarranted assumption of power and
rely upon the acquiescence of the state and city authori-
ties.   The question is not a technical one depending on
unimportant forms.   It is a matter of substantial right
asserted ·against the public by a private corporation.
Shall plaintiff obtain a state or local street franchise
through.inadvertence?   The thing is impossible.   Neither
the performance of conditions nor the payment of taxes
by plaintiff will give validity to the unauthorized acts
of the public officials with which it dealt.   (*Matter of
Rhinehart* v. *Redfield,* 93 App. 'Div. 410; affirmed, 179
N. Y. 569, on opinion of WOODWARD, J., below.)   To
put its wires in the streets on the surface would have
been an unlawful act.   The right now asserted to put
the wires in the subway is, as we have seen, ancillary ·to
the alleged right to string them on poles in the streets..
A municipal corporation, under exceptional circumstances,
may be deemed to have waived its rights or estopped
itself from asserting that a consent which it might give
had actually been given where it had been given informally
as against a corporation to which such a franchise or con-
sent might have been formally granted..   (*Town of Essex* v.
*N. E. Tel. Co. of Mass.,* 239 U. S. 313, 321.)   But plaintiff
is bound by the limitations of its corporate franchise.   It
cannot gain the corporate power to receive a franchise,
as against the city, by unlawfully asserting such power,
and the city has no power to grant it the right to occupy
the streets unless unmistakably authorized thereto by
the legislature.   (*Beekman* v. *Third Ave. R. R. Co.,*
153 N. Y. 144, 152; *People ex rel. City of New York* v.

*N. Y. Railways Co.*, 217 N. Y. 310.)   It follows that it
may not recover in this action.

What rights other companies, organized under the
same act to perform other duties, may possess may
not be determined on this record.   Distinctions may
exist which should not be anticipated.   The court decides
the particular issue without attempting to classify all
the corporations organized under the Telegraph Act,
either with the Western Union Telegraph Company on
the one hand or with the plaintiff on the other.

The judgment appealed from should be affirmed, with
costs.

CARDOZO, J. (dissenting).   I concur in Judge POUND'S
conclusions, and in the reasoning which supports them.

The plaintiff did not get the right to occupy the highway
unless it also got the right of eminent domain.   The same
sentence of the statute which says that telegraph com-
panies shall have the one right, says also that they shall
have the other.   We must determine whether the plain-
tiff's business is so affected with a public use as to justify
a holding that it comes by implication within the grant of
these extraordinary privileges.   I think the question is not
strictly whether the legislature *could* confer such privi-
leges by words clearly sufficient to indicate that intent.
I think the question rather is whether the public use, if
any, is so related to that served by the telegraph or the
telephone generally as to make the inference of intent a
fair one.

The purpose of the telegraph or telephone as commonly
employed is not to carry information to the telegraph
company itself.   The purpose is to disseminate infor-
mation among the public indiscriminately.   The common
welfare is served by freedom of communication, whether
men or things or thoughts be the subjects of transmission.
The telegraph and the telephone like the railroads and
the post are agencies of commerce.   They spread abroad

the knowledge without which life could be ill maintained in a complex order of society.

The plaintiff is not organized to disseminate information indiscriminately among the members of the public in aid of the myriad interests which touch the lives of men. It is organized for the conveyance of a particular form of intelligence to a particular member of the public, *i. e.*, to itself, in aid of a particular and private business. A railroad organized with the restriction that it should carry the products of the organizer and nothing else, would be a railroad in name, but not one organized for public service. A telephone company organized by a caterer or a jeweler or a department store with the restriction that it must carry no messages except orders for the wares or services of the organizer would meet with difficulty if it should attempt to exercise the power of eminent domain. This plaintiff seeks to exercise a like power in aid of its business as a private watchman. I do not think it is an answer to say that the business is a useful one and tends to the preservation of the peace and order of society. Private in its essential purpose, if not in the range or degree of its utility, it, none the less, remains. I do not say that the range or degree of its utility would not justify the legislature in investing it with special rights by special or explicit grant. That question is not here. I say merely that the private and selfish limits of its purposes forbid the implication of such a grant from words of doubtful import. The plaintiff is not a subordinate governmental agency like a volunteer fire department (*Trustees of Exempt Firemen's Ben. Fund v. Roome,* 93 N. Y. 313; *Fox v. Mohawk & H. R. Humane Soc.,* 165 N. Y. 517, 527), organized for the public good and supplying protection in a field where government has not entered. In a settled community, with an organized police force, with life and property defended by all the power of the state, it undertakes to supplement the protection of the police by the use of private watchmen

furnished by itself.   I speak of them as private watchmen though they may be sworn in as special officers.   The company procures this rank for them in no spirit of public helpfulness, but merely to increase the effectiveness of service to subscribers.   It does not come under a duty to . watch the property of persons not subscribers, to warn them of impending danger, or to respond with relief to their summons of distress.   Protection is restricted to those who pay the price.

I think we should be slow to hold that the legislature intended by words of general import to delegate the power of eminent domain in aid of such a purpose. These telegraphic signals are not employed as a means whereby the company's subscribers may communicate with one another and thus potentially with all the world. They are merely signals to the company that something has happened to call for investigation by a watchman in fulfillment of its contract.   The signal may mean a burglar or a forgetful householder or a window broken by a storm.   I can discover only a remote connection between the good to be attained by signaling a contractor in aid of the, fulfillment of his contract, and the good resulting from the free interchange of ideas among the members of the community by telegram or telephone or post in aid of the multifarious needs and interests of life in organized society.   Private detective agencies are not organs of government.   The state is still the primary guardian of the peace and . order of its members.   Its power to condemn the property of the citizen is not to be extended by doubtful inference and remote analogy to agencies organized for private gain which supplement its action.   In the peace of the state, most men pass their lives, and find repose in its protection.   Those who wish a special protection beyond that which most of us find necessary and which government supplies, have not yet been given the right to obtain it by the occupation of the land of others or by encroachment on the public ways.

I think the history of the statute confirms this estimate of its purpose. If we carry ourselves back in thought to 1848, we cannot doubt that the extraordinary powers conferred upon telegraph companies by the general statute of that year (L. 1848, ch. 265) went to them in their capacity as purveyors of intelligence, fulfilling functions akin to those of common carriers, like the railroads and the post. They were authorized to construct lines of telegraph along the public roads and highways and (upon payment of just compensation) over lands in private ownership, and they were required to receive dispatches from any member of the public, and to transmit them with impartiality and in the order of receipt (secs. 5, 11 and 12). The wording of the statute, in so far as it confers the right to occupy the highways, is substantially the same as that of the Post Roads Act of Congress, adopted July 24, 1866 (14 St. 221, ch. 230), which gave to every telegraph company the right to construct, maintain and operate its lines along the post roads of the nation (*Richmond* v. *Southern Bell Tel. & Tel. Co.*, 174 U. S. 761; *Postal Tel.-Cable Co.* v. *City of Richmond*, 249 U. S. 252; *People ex rel. Postal Tel.- Cable Co.* v. *State Bd. of Tax Commissioners*, 224 N. Y. 167). The end in view was the same under one statute as under the other, the fostering, for the public good, of the public agencies of commerce. It is true that by a ruling of the Supreme Court, telephone companies do not enjoy the protection of the Federal act (*Richmond* v. *Southern Bell Tel. & Tel. Co.*, *supra*), and that by a ruling of this court (*Hudson River Tel. Co.* v. *Watervliet T. & Ry. Co.*, 135 N. Y. 393, 405), now confirmed by legislation (Transp. Corp. Law, Cons. Laws, ch. 33, sec. 100), they do enjoy like privileges with telegraph companies of the older form under the statutes of the state. That ruling found its basis in the fact that the telephone, like the telegraph, is a purveyor of intelligence by electricity, and thus fulfils a like function as an instrumentality of

commerce. But even under our statute, the function fulfilled is of the essence of the privilege enjoyed. No one, I think, would assert that the plaintiff, even though it transmits electric signals by methods not unknown in 1866, is an instrumentality of commerce entitled as of right to occupy the highways of the nation. I see no better reason to believe that it is entitled as of right to occupy the highways of the state.

I do not forget that the plaintiff has been incorporated under the Telegraph Act, and that the legislature has recognized the regularity of its corporate existence. That is not equivalent to recognition of its right to obstruct the highways of the public, or to condemn the lands of private owners, irrespective of the purpose served by condemnation or obstruction. Any seven men may make themselves a telegraph company by filing a certificate. When they go farther, and attempt to occupy the highways or condemn the property of their neighbors, they must show something more than regularity of corporate existence. They must show that they are acting in aid of public purposes, and not merely that, but in aid of *the* public purposes which the legislature had in view when it said that telegraph companies might exercise as its delegate an important attribute of sovereignty. It is true that section 102 of the statute (Transp. Corp. Law) says that every " such corporation," *i. e.,* every telegraph and telephone company, may occupy and. condemn. It is also true, however, that section 103 of the statute says that " every such corporation," shall receive dispatches from the public and transmit them as received. Duty and privilege are imposed and granted in terms of equal generality. Construction of the statute, if permissible to exclude the plaintiff from the duty, is equally permissible to exclude it from the privilege. I think that sections 102 and 103 of the present statute, like the corresponding sections of the act of 1848, must be limited in their application to corporations serving the public

as instrumentalities of commerce.   The readiness of the
legislature to clothe with extraordinary powers the tele-
graph companies which it knew in 1848 and which fulfilled
the function of common carriers of intelligence, and
even to clothe telephone companies with like powers
since they fulfill a like function, is little evidence of its
readiness to extend the same powers to corporations
which are not common carriers of intelligence, and
which, if they serve any public use, serve one that is
doubtful and limited and indisputably different.

The plaintiff lays much stress on section 105 of the
Transportation Corporations Law.   Its history is, I
think, significant.   It goes back to 1880.   By chapter 90
of the Laws of 1880, entitled "An act to authorize the
police department or board of police of any city to
appoint policemen of district telegraph companies,"
authority was given for the appointment of special
policemen, not exceeding two hundred, in aid of a tele-
graphic system of signaling to a central office (See also
Consolidation Act, L. 1882, ch. 410, sec. 314).   That
was the statute regulating the subject at the time of
the incorporation of the plaintiff in 1883.   It was not
an amendment of the act of 1848, under which telegraph
companies were organized.   It was not a term of the
charter.   It was an independent grant of power.   The
legislature knew that signal companies existed; but we
have no reason to suppose that it also knew under what
statutes they had been incorporated, or whether they had
strung their wires under the claim of a perpetual franchise,
or under temporary or special license.   In point of fact,
the plaintiff's predecessor, then the owner of this plant, was
not organized under the Telegraph Act at all, but under
the act for the formation of business corporations.   The
act of 1880, first adopted as an independent statute,
did not come into the Transportation Corporations Law
till 1890 (L. 1890, ch. 566, sec. 105, repealing L. 1880,
ch. 90), and there it has since remained.   If it did not

have the effect, when it stood alone, of clothing the plaintiff with the power of eminent domain, I do not think it gained that effect when in the course of revision it was brought into a different context.   Something more must be shown to sustain the claim of title to a privilege so extraordinary.   In the process of the consolidation of a multitude of scattered statutes, there have come into the Transportation Corporations Law fragments of legislation which, if related to every preceding section, might bring the plaintiff and like companies within the letter of the grant.   The problem is not solved so easily. It remains in the end a problem in the reading of the legislature's intention, with a larger problem of constitutional power ever in the background.   The nature of the use determines the nature of the privilege.

I find little force in the argument of practical construction.   If there has been practical construction in favor of the company, there has also been practical construction against it, and that by the one person best acquainted with the situation, the company itself.   The Public Service Commissions Law (Cons. Law, ch. 48), requires every telegraph and telephone company to file schedules of its charges (sec. 92), and to make yearly reports to the commission (sec. 95).   No schedules or reports have been filed by the plaintiff, though the failure to file them, if they are due, has subjected it to heavy penalties (sec. 102).   I think that telegraph and telephone companies within the purview of the Public Service Commissions Law are those that would be so recognized in the common speech of men. The plaintiff has rightly acted on the assumption that it does not come within that class.   By the same token it does not come within the class of telegraph or telephone companies invested with the power of eminent domain. I lay slight stress on the circumstance that public officers did not attempt to disturb the wires when they were strung across the housetops.   We may get some notion of the slight significance of silence and inaction when we

recall that the wires were strung in the beginning by the plaintiff's predecessor, organized as a business corporation, and, therefore, without shadow of right, in default of special license, to occupy the public ways.

I am not free from doubt by any means. The principle, however, is fundamental that "every public grant of property, or of privileges or franchises, if ambiguous, is to be construed against the grantee and in favor of the public" (*Cent. Transp. Co.* v. *Pullman Palace Car Co.*, 139 U. S. 24, 49; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 544). It is in favor of the public that my doubts are now resolved.

The judgment should be affirmed with costs.

ANDREWS, J., concurs in memorandum with CRANE, J.; CHASE and COLLIN, JJ., concur with both CRANE and ANDREWS, JJ.; CARDOZO and POUND, JJ., read dissenting opinions; HISCOCK, Ch. J., not voting.

Judgments reversed, etc.