EMPIRE CITY SUBWAY Co., LIMITED, Plaintiff, *v.* CITY OF NEW YORK and Others, Defendants.

Supreme Court, Special Term, New York County, June 4, 1938.

*Bleakley, Platt & Walker [Frank A. Fritz* of counsel], for the plaintiff.

*William C. Chanler, Corporation Counsel,* and *Edmund B. Hennefeld,* for the defendants.

BLACK, J.   This is an action by plaintiff for a declaratory judgment holding that its subway conduits are not subject to taxation under the city sales tax (Local Law No. 20, published as No. 21, p. 143, amd. by Local Law No. 24, published as No. 25, of 1934, p. 164), and that its conduits are not subject to the city excise tax provided for under the utility excise tax laws (Local Law No. 19

of 1933, p. 127; Local Law No. 10, 1934, p. 115; Local Law No. 21, published as No. 22, of 1934, p. 151). A preliminary injunction against the collection of these taxes was granted in this action by Mr. Justice ROSENMAN.

Defendant city of New York urges that the local laws under which these taxes were assessed provide for a hearing before the comptroller which is " adequate to the needs of the plaintiff and is also the exclusive procedure to be followed." And the city says there is an additional remedy of a payment under protest, followed by an application for a refund and order for a certiorari to review an adverse termination against the plaintiff by the comptroller. And the city says that plaintiff has failed to exhaust its remedies prior to commencing its present action. The city further urges that there are issues of fact involved in this action which deprive this court of jurisdiction to try the case, and that there are no special and extraordinary circumstances which warrant entertaining the present action for a declaratory judgment and an injunction either as a matter of law or discretion. And the city contends that the comptroller has exclusive jurisdiction, and it demands the dismissal of the complaint.

This court does not agree with these contentions of the city, for the reasons set out herein.

At the beginning of the hearing before me a motion was made, and the corporation counsel urged, that this was a case where serious questions of fact were involved, and that the court did not have jurisdiction to proceed. This court retained jurisdiction until enough of the facts developed to decide whether to go on with the case or not. The court, believing that no real questions of fact would have to be tried, proceeded with the hearing, at which its opinion that there were no questions of fact was confirmed.

An agitation began in the early eighties to put electric wires under ground. They were unsightly, inconvenient and more or less of a menace.

In 1884 the Legislature passed a law that all wires when overhead should be placed under ground (Laws of 1884, chap. 534), and by chapter 499 of the Laws of 1885 a board of commissioners of electrical subways was created.

By the Laws of 1887 (Chap. 716) these commissioners and the mayor became the city " board of electrical control " to evolve a plan for putting the overhead wires under the ground.

By the Laws of 1891 (Chap. 231) this board was authorized to contract with this plaintiff for the construction and operation of underground conduits for telegraph, telephone and low tension conductors only. The duties of the electrical board, by chapter 378

of the Laws of 1897, fell to the commissioner of public buildings, lighting and supplies, and were transferred from him by chapter 429 of the Laws of 1907 to the city commissioner of water supply, gas and electricity.

The certificate of incorporation of plaintiff, granted July 1, 1890, gave it power to make and maintain and equip, operate or have electrical conductors, subways, conduits, ducts and house and other subsidiary connections in New York and to lease space to any person having power to operate electrical conductors including any company or corporation having or which shall acquire lawful power to manufacture, use or supply electricity. The charter gave plaintiff no power to engage in telephony or telegraphy.

While it thus appears that the plaintiff had the power to have "electrical conductors," it did not appear from the evidence adduced that the plaintiff ever did sell or lease electrical conductors. The court understands "electrical conductors" to mean wires or appliances capable of transmitting electricity. It does not mean the housing through which such wires pass. If it had developed during the trial that any "conductors" had been sold or leased, maintained, equipped or operated by plaintiff, the charter provisions would have been important. They were not important because whatever power a concern has in its charter does not affect the question as to whether something else that the company actually does would subject it to taxation.

The evidence shows that the city first entered into a contract with the plaintiff in May, 1891, as on December 8, 1890, the Consolidated Company had conveyed to plaintiff all its subway conduits and ducts used to house the electrical light and power conductors for the use of the Edison Electric Illuminating Company, and used the subways, conduits and ducts for telephone and telegraph "conductors." The new contract between the city and the plaintiff in its first paragraph provided that plaintiff should build, equip, maintain and operate subways, conduits and ducts for the low tension light and power conductors of the Edison Electric Illuminating Company, and for telegraph and telephone companies.

The contract also provided that the space in such ducts, conduits and subways may be leased only to concerns having lawful power to operate telegraph or telephone conductors in the city highways.

The contract also provided that plaintiff should supply the city without charge "all space necessary for its subways, conduits and ducts for electrical conductors."

Conductors are defined by the contract as "feeders, wires, and all their appliances used for transmitting electricity underground."

There is also a paragraph in the contract providing that " all companies occupying space in said subways, conduits and ducts shall cover their conductors," and one provision of the contract is that the conductors " must be maintained and repaired " by the company owning them (under supervision of plaintiff).

Another provision of the contract permits the city to recapture the plaintiff's system of ducts, conduits, etc.

The plaintiff's business is the building and leasing of subways or conduits for the housing of cables of the companies that conduct telephone, telegraph and low tension systems, and the police, fire and water departments. The ducts of hollow pipe, tile or wood tubing are laid end to end between brick and cement manholes. The telephone and telegraph conductors are insulated wires in lead sheaths.

First as to the liability of the plaintiff under the Sales Tax Law (Local Law No. 24, published as No. 25, for 1934, amdg. Local Law No. 20, published as No. 21, for 1934) for $97,972.90 for the period from December 10, 1934, to December 31, 1935.

In subdivision (d) of section 1 of that law, imposing a tax upon " receipts," the word " receipts " is defined as the total amount of the sales price of all property and services specified in section 2 of this local law. The only subdivision of section 2 that the city claims applies to this case is as follows:

Two per centum for year ending December 31, 1935, upon the amount of receipts from every sale in the city of New York of " (b) Gas, electricity and steam, and gas, electric, steam, telephone and telegraph service, for domestic or commercial consumption."

The evidence shows that during the year the tax was assessed the plaintiff sold neither electricity nor telephone and telegraphic service.

The third paragraph of section 2 of Local Law No. 24 of 1934, under Schedule " A," says the " tax * * * shall be paid by the purchaser to the vendor for and on account of the city of New York, and the vendor shall be liable for the collection or the service rendered."

This indicates that the plaintiff would only be liable for the tax on something it sold, and there is not the slightest evidence that it sold or could collect any receipts for telephone or telegraph service, or electricity. It neither furnished the first two services, nor did it manufacture or sell " electricity."

The able assistant corporation counsel, who tried the case for the city, ingeniously argued that plaintiff was engaged in supplying telegraph, telephone and electric service, and was, therefore, subject to tax, because it furnished the channel through which plaintiff's

tenant companies drew their cables and conductors. And the city submits its view as to what the Municipal Assembly intended by Local Law No. 21 of 1934, saying at page 16 of its trial memorandum: " It may be argued that taking the quoted words literally and strictly plaintiff is not subject in most respects to supervision ' by the department of public service.' To this it can be answered that we are concerned not with a literal interpretation out of context but rather with the fundamental legislative intent expressed within the four corners of the statute."

The city also contended that: " The legislative intent [of Local Law No. 21] was to reach any and all other utilities and this intent can only be made effective, and undesirable discrimination avoided, by recognizing plaintiff's business for what it is, the furnishing of telephone or telegraph service."

This contention can only mean that the court has discretion to say what the intent of the law was. The court has no discretion, where the plain words of a law admit of no doubt to determine what the " intent " of the law was.

In this case there was no evidence to sustain the city's contention. On the contrary, there was evidence that the plaintiff's tenants furnished the telephony and telegraphy and electricity, and the tenants charged their customers for it. In order that the city's full contention should appear upon the record the court admitted almost everything its counsel offered, but the physical facts developed at the trial showed that there were no disputed facts, but merely disputed contentions. To have adopted the city's theory of the case would have meant to adopt what the city claimed was the intent of the law. This would have amounted to taxation by " construction."

Now, as to plaintiff's liability of $312,861.01 (including penalties) under the utility excise taxes under Local Law No. 19 of 1933, Local Law No. 10 of 1934, and Local Law No. 21 of 1934.

*First*, under Local Law No. 19 of 1933, the taxes are imposed only upon those companies which are subject to the supervision of either division of the Public Service Commission (§ 3). A like provision is found in Local Law No. 10 of 1934 (§ 2) and in Local Law No. 21 of 1934.

Thus, the sole test of taxability under these Local Laws, No. 19 of 1933 and No. 10 of 1934, is whether or not the plaintiff was subject to the supervision of the Public Service Commission from September 1, 1933, to December 31, 1934. The taxes assessed for this period, including penalties, amount to $171,652.38.

The city of New York, in a schedule attached to letter of the deputy comptroller, dated December 6, 1937 (Plaintiff's Exhibit

22), attempts to tax the gross income of plaintiff for the period March 1, 1934, to December 31, 1934, under Local Law No. 10 of 1934, the tax and penalties aggregating $129,595.85, on the basis of three per centum of its gross income. The city is apparently claiming $64,797 too much, as Local Law No. 10 provides for an excise tax of only one and one-half per centum of the gross income. The corporation counsel advises that this error will be corrected.

Under Local Law No. 21 of 1934 (published as No. 22, p. 152) the tax is imposed upon " every utility doing business in the city of New York " (§ 2). The word " utility " is defined as " any person subject to the supervision of the department of public service * * * and every person who shall engage in the business of furnishing or selling * * * electric * * * telephone or telegraph service," whether or not such person is subject to the supervision of the department of public service (§ 1, subd. [d]).

As hereinafter shown with respect to utility excise taxes under Local Law No. 19 of 1933 and Local Law No. 10 of 1934, the plaintiff was not subject during the taxable period in question to the supervision of the Public Service Commission, and, as heretofore shown with respect to the sales tax (Local Law No. 24 of 1934), it did not engage in the furnishing or sale of electric, telephone or telegraph service.

In 1922 this very question of supervision came before Mr. Justice FORD in the case of *City of New York* v. *Prendergast,* when the Public Service Commission sought jurisdiction of the Consolidated Telegraph and Electrical Subway Company, the parent company which transferred its low tension subway and telephone and telegraph subways to plaintiff, the Empire City Subway Company. This attempt on the part of the Public Service Commission was vigorously fought by the city of New York, which prevented it by a writ of prohibition. Mr. Justice FORD granted the order of prohibition (*Matter of City of New York* v. *Prendergast,* N. Y. L. J. March 10, 1922, p. 2019), and declared that " The Public Service Commission is going beyond its jurisdiction when it undertakes to exercise supervision or control over the Consolidated Telegraph and Electrical Subway Company. (*People ex rel. New York, N. H. & H. R. R. Co.* v. *Willcox,* 200 N. Y. 423.) " This order of Justice FORD was affirmed by the Appellate Division of this Department (202 App. Div. 308).

Later, the Public Service Commission, in an order entered by it, discontinued a proceeding it had begun, to determine its jurisdiction over the Empire City Subway Company, Limited.

The city of New York had urged in its brief in *Matter of City of New York* v. *Prendergast* (202 App. Div. 308), that the Consolidated Company was a " landlord company." " It is a landlord company engaged in the business of renting in a structure underground. It differs in no particular from a landlord company renting space in a structure overground on private land. It has tenants who are electrical corporations and these tenants come within the jurisdiction of the Public Service Commission. But that fact no more makes the landlord company an ' electrical corporation ' than would the fact that the Edison Electrical Illuminating Company occupying the relation of tenant to the corporation owning the Woolworth Building, because that corporation rented space for offices to the Edison Company, makes the Woolworth Company or landlord an ' electrical corporation.' "

And the Appellate Division in the same case held at page 313 of volume 202: " As will appear from the consideration of the legislation with respect to the electrical subways in the city of New York, there was no purpose of serving the public for which the public was required to pay."

When it comes to fixing the tax on the gross income of conduit companies (Local Law No. 2 of 1938) for 1938 the committee on finance of the city council reported in writing that " This bill imposes a tax on a class of utility companies which inadvertently have been omitted from previous taxes levied on all other utilities." (City Record, April 7, 1938, p. 2313.)

Upon the application by plaintiff for a temporary injunction in the case at bar, Mr. Justice ROSENMAN held that " the facts of this case bring it within the rule of the case of *Dun & Bradstreet, Inc.*, v. *City of New York* (276 N. Y. 198)." (See, also, opinion of Mr. Justice NOONAN in the case of *Sterling Bag Co., Inc.*, v. *City of New York*, 168 Misc. 179, and opinion of Mr. Justice LAUER, denying reargument in the same case, N. Y. L. J. May 17, 1938, p. 2385.) The court does not believe, as the city asserts, that the case at bar falls within the carefully considered decision written by Mr. Justice COHN for the Appellate Division of this Department in the case of *German Masonic Temple Assn.* v. *City of New York* (253 App. Div. 680), and only recently handed down, as here there is no issue of fact involved.

It is hoped that the observations the court is about to make will not be regarded as gratuitous, but in the full realization of its duty and its oath the court feels that they are not only apposite but are specially called for by the situation in some courts today. This court is old-fashioned enough to still believe that ours is a government of men under laws, and not a government where judges and

courts may substitute their " discretion " for law — because the life of every law is breathed into it by the matured and considered judgment of the people who vote for it. Law, which is really a condition imposed by circumstances, is the crystallization of public opinion, and judges have no right to break the crystal of the law. That same public opinion has under the Constitution the right to change the law, and has frequently changed it. But it was never intended that our judges should change the laws nor make the laws. If judges can read taxes into a law, there is danger that they may read taxes out of a law. Nor was it ever intended that they should be the censors of our laws. Such presumption was never contemplated by the framers of our laws or our Constitutions. If judges may write opinions in which they say what the law is and then in the same breath presume to exercise their discretion to set aside the laws the people have made, then ours is no longer a government of laws, but a government of judges. A judge has no more right to make the laws than an executive or a Legislature has to construe them after they are made.

If constitutional or statutory rights are set at naught, then these three dire results may follow: *First.* No man can say what the law is or what it may be declared to be. *Second.* There will follow less respect for the courts. *Third.* Ours will be a government by whim, which it is the very object of the law to prevent.

This court has no criticism for any decision by any court, but if it had been misled into trying to regulate the conduct of citizens by substituting the exercise of its discretion for the plain words of written Constitutions or statutes, it would feel that it had betrayed the trust reposed in it and had violated its oath to sustain the Constitution. It believes that such decisions on its part would have indorsed a government by caprice, which would totally undermine the fundamental ideas of our founders. As between decisions by whim (which may differ with every judge who renders them) and what may be regarded as a too strict interpretation of Constitutions and laws, there is far less danger in the latter. When a court assumes to exercise its discretion and sets aside a constitutional provision or a statute it is substituting government by judicial opinion for government by law.

However much this court might feel inclined to sympathize with the praiseworthy efforts of the city to raise funds for the purposes sought to be accomplished, it is not willing to pay the price of reading into law a meaning it does not have. In this connection the court wishes to add that while no doubt exists in this case as to the meaning of the laws, in many cases much of the time of our courts is taken up in attempting to arrive at the intent of legislators and

Legislatures. The courts can only gather such intent from the words of the act or Constitution being construed.

There should be a penalty that would fall upon those who deny a constitutional right to a litigant or fail to grant him protection. That is already the law relating to a refusal to sign a writ of habeas corpus (Civ. Prac. Act, § 1235) and it might well be extended to apply to the denial of any property right guaranteed by our Constitution and laws. It may also be that there should be more safeguards in drafting the statutes, so that the fear of upsetting them may be reduced to a minimum. New York has great judges who have the character and ability, with infinite labor, patience and wisdom, to carry out their duties, and there are but few of them who do not realize that they have no power to frustrate the Constitution adopted by the people by their own votes or the laws passed by them through their duly constituted representatives.

Settle judgment.