HOLMES ELECTRIC PROTECTIVE COMPANY, Plaintiff, *v.* CITY OF
NEW YORK et al., Defendants.

Supreme Court, Special Term, New York County, March 1, 1951.

*Frank A. Fritz, Arthur P. West, Arthur C. Patterson* and *Joseph B. Diamond* for plaintiff.

*John P. McGrath, Corporation Counsel (Stanley Buchsbaum* and *Morris L. Heath* of counsel), for defendants.

Rabin, J. Heretofore and prior to the commencement of this action plaintiff instituted an article 78 proceeding to review the action of the comptroller of the City of New York in imposing on plaintiff a utility tax for the year 1935. Plaintiff was successful in that proceeding, the Appellate Division holding that plaintiff was not engaged in the sale of electric, telephone or telegraphic service within the meaning of the then existing tax laws (*Matter of Holmes Elec. Protective Co. v. McGoldrick,* 262 App. Div. 514, 517, affd. 288 N. Y. 635).

But subsequent to 1935 and in 1938 the local law setting up the utility tax under which it was sought to tax the plaintiff was amended so as to specifically define " Telegraphic Service," (Local Laws, 1938, No. 22 of City of New York) and the present action involves the question as to whether, under the law as changed, plaintiff is obligated to pay the tax imposed.

Approximately 90% of the gross income of the plaintiff, Holmes Electric Protective Company, hereinafter referred to as " Holmes ", is attributable to certain protective services rendered by Holmes in the event of an unauthorized entry, upon premises safeguarded by Holmes, causing an electrical impulse which is transmitted by electrical wires strategically placed by Holmes about such premises and connected with one of the Holmes offices where that impulse serves as an alarm. This

action is to determine whether the income thus earned is taxable by the City of New York, pursuant to title Q of chapter 41 of the Administrative Code of the City of New York (§ Q41–2.0, as added by Local Laws, 1938, No. 22 of City of New York) which imposes a " utility excise tax " of 1% of gross income on " any person subject to the supervision of either division of the department of public service, and every person whether or not such person is subject to such supervision to the extent that such person shall engage in the business of furnishing or selling to other persons, gas, electricity, steam, water, refrigeration, telephony and/or telegraphy or who shall engage in the business of furnishing or selling to other persons gas, electric, steam, water, refrigeration, telephone or telegraph service." (Administrative Code, § Q41–1.0, former subd. 6, renum. in part subd. 7 by Local Laws, 1940, No. 80 of City of New York.) Holmes is not within the jurisdiction of the Public Service Commission (*Matter of Holmes Elec. Protective Co.*, 37 P. U. R. [N.S.] 49) and the issue here is whether Holmes is furnishing or selling telegraph service which by the 1938 amendment is defined in subdivision 9 of section Q41–1.0 of the Administrative Code (1950 Cum. Supp.) as follows: " any service requiring the use of electric or telegraph wires, equipment or device, instruments or any other means employed or employable in the transmission of messages, signals, alarms, notices, news, pictures, music or information of any kind."

The plaintiff has paid taxes, under protest, pursuant to the aforesaid provisions from July 1, 1938, to April 30, 1942. The former date represents the time when the quoted utility excise tax, in its present form, became effective; the latter date is the time when it was finally adjudged in the prior action that the plaintiff herein was not obliged to pay a utility excise tax under the predecessor taxing ordinance which did not contain the definition which is now found in subdivision 9 of section Q41–1.0 of the Administrative Code (*Matter of Holmes Elec. Protective Co.* v. *McGoldrick, supra*). The plaintiff here seeks to recover the sum of $94,274.09, which represents the moneys thus paid under protest, with interest, and to obtain declaratory and injunctive relief which would adjudicate that Holmes need not make any further payments under the present New York City utility excise tax and to restrain the defendants and their successors from attempting to enforce such tax law against the plaintiff. The plaintiff contends that it is not comprised within the class intended to be taxed by the aforesaid ordinance

and, if within that class, then the tax is invalid as in excess of the city's power under the enabling State legislation and in any event is unconstitutional. The defendants have raised certain procedural defenses to the maintenance of this action which need not here be considered since previously litigated (*Holmes Elec. Protective Co. v. City of New York,* 191 Misc. 378, affd. 275 App. Div. 908). The issue in the case before me was joined by the contention of the defendants that Holmes was engaged in the kind of business which was intended to be taxed by the City of New York pursuant to the quoted provisions of the Administrative Code and that the enabling legislation permitted the imposition of such tax and that no constitutional prohibitions exist to deprive that municipality of the power thus to tax Holmes.

In *Matter of Holmes Elec. Protective Co. v. McGoldrick* (262 App. Div. 514, 515–516, *supra*) Mr. Justice DORE depicted the business in which Holmes is engaged and that description comports with the evidence which I heard:

'' Petitioner's business is the protection of its customers' premises against burglary or unauthorized entry. To achieve this end it offers various types of protective service such as patrol and watchman service, electric protective service, electric sentinel service, local holdup alarm service, etc. Contracts are executed with each customer providing for the particular type of service desired. Thus petitioner so wires the premises to be protected that on any disturbance of the circuit from unauthorized entry or other physical contact, an electric alarm signal is sent over wires leased from the New York Telephone Company (or in part owned by petitioner) connecting the customer's premises with one of petitioner's offices. At such offices throughout the city, petitioner maintains a force of guards and on receipt of the alarm signal showing a disturbance of the circuit on the customer's premises, a guard is immediately dispatched to ascertain the cause of the disturbance. Only a small percentage of the alarms is due to either attempted or successful unauthorized entry. But the guards are authorized to detain persons whom they find on the premises, who are not lawfully there, and petitioner also agrees, under certain conditions, to watch the premises after an alarm, for a stated period, after notifying the subscriber of the result of an inspection, until the subscriber or his representative arrives.

'' In the case of authorized entry, code signals previously agreed on between petitioner and its customer are sent over the

wires, *e.g.*, to signal the arrival of the customer on the premises in the morning or the departure of the customer from the premises at night. A watch signal service is furnished to answer the ancient query ' Who shall watch the watchers? ' Through this service, the customer's watchman is obliged from time to time to signal the Holmes central office to show he is still on the watch, and if the prearranged signals are not received, the petitioner dispatches a guard to ascertain the cause and sends an emergency notification, if necessary, to the customer by telephone or telegraph. Holdup alarm signals are also furnished, *e.g.*, to banks, providing foot-rails and press buttons located on the premises, which cause a siren or bell to sound an alarm in case of emergency. A central station emergency alarm service may be procured which, when a signal is received from the customer's premises over the wires, requires petitioner promptly to notify the police department and give the customer's name and the address of the premises from which the alarm was received.

'' Receipts from all of such services were taxed by the comptroller except those from patrol service, watchman patrol service, watch service and part of holdup alarm service.''

Upon the basis of the foregoing description of Holmes' business, the Appellate Division for the First Department, as heretofore indicated, held that Holmes was not engaged in the sale of telegraph services and, therefore, that Holmes was not taxable under the utility excise tax under review in that case. The tax ordinance before me, however, unlike the tax ordinance construed by the First Department in *Matter of Holmes Elec. Protective Co.* v. *McGoldrick* (*supra*) contains a definition of '' telegraph service '' in subdivision 8 (which in 1940 became subd. 9, renum. by Local Laws, 1940, No. 80 of City of New York) of section Q41–1.0 of the Administrative Code, which was added to the local utility tax laws on July 1, 1938 (Local Laws, 1938, No. 22 of City of New York). In determining what constitutes '' telegraph service '' under the new act, we do not construe it to mean merely '' telegraphic service as it is ordinarily understood '' (*Matter of Holmes Elec. Protective Co.* v. *McGoldrick, supra,* p. 517), but must give meaning to the definition added to the act. This definition manifests the legislative emphasis upon the nature of the devices or facilities employed by the taxpayer in furnishing its services. For this reason the instant case is not governed by the decision of the First Department in *Matter of Holmes Elec. Protective Co.* v. *McGoldrick* (*supra*) and it is

necessary to examine the devices and facilities used in order to determine whether the services furnished by the taxpayer come within the meaning of the words " telegraph service " as now defined. Accordingly it is appropriate for me to supplement the description by that court of Holmes' business with that evidence introduced in the instant case which tends to demonstrate the extent to which the services sold and furnished by Holmes require " the use of electric or telegraph wires * * * in the transmission of messages, signals, alarms ".

The plaintiff in its business leases and owns a total of approximately 42,000 miles of connecting wires. At the end of 1943 it leased 18,450 miles of such wires of which 17,870 miles ran under the streets of the city of New York; and at the end of 1943 Holmes owned 23,550 miles of connecting wires of which 20,160 miles ran under the streets of the city of New York. These wires, together with the electrical equipment and devices installed by Holmes at the premises of its clients and at its various central stations located throughout the city for the purpose of transmitting and receiving signals, comprise almost two thirds of the total assets of Holmes. The monthly payments made to Holmes by its clients are measured by the number of units wired for protection and it was testified upon the trial by the president of Holmes that there is no difference in the " basic electric service charge based on the number of hours per day that the premises are enclosed and protected " by the Holmes service.

I conclude from the foregoing that the services sold by Holmes necessarily require the use of electric or telegraph wires for the transmission of messages, signals and alarms and, therefore, that Holmes is literally within the class of business activities subject to the utility excise tax of the city of New York.

If, in addition to the explicit language of the applicable ordinance, I am required to employ " propriety and justice * * * as guides to the true legislative intent " (*Matter of United Parcel Service of New York* v. *Joseph,* 272 App. Div. 194, 201, affd. 297 N. Y. 1004), I nevertheless reach the same conclusion. The plaintiff has long enjoyed special rights and privileges in the use of the public streets of the city of New York. (*Holmes Elec. Protective Co.* v. *Williams,* 228 N. Y. 407; *Matter of Owl Protective Co.* v. *Public Service Comm.,* 254 App. Div. 600.) The electrical wires necessary to the protective services furnished by Holmes at a profit to Holmes require the use of property and facilities which belong to the people

of the city of New York. Notwithstanding these characteristics of the business of the plaintiff, Holmes has not been subject to the jurisdiction of the Public Service Commission (*Matter of Holmes Elec. Protective Co.,* 37 P. U. R. [N.S.] 49, *supra*), nor, to date, has it been judicially held subject to the sales or excise taxes imposed by the City of New York upon utilities and quasi-utilities for the purpose of affording relief to those needy and unemployed persons in that city. It is my view that in 1938 the Legislature of the City of New York acted to rectify this situation.

The law before me for construction is a consequence of the emergency measures adopted by the State and City of New York to meet the dire situation presented by the depression in the decade beginning in 1930. The power conferred upon the City of New York in 1933 to enter the field of indirect or excise taxation was sustained by the Court of Appeals with cognizance that " Broad and unprecedented  *  *  *  is the license so conferred ". (*New York Steam Corp.* v. *City of New York,* 268 N. Y. 137, 145; see, also, *Matter of Brown Print. Co.,* 285 N. Y. 47, 51–52.) There followed in annual sequence sales and excise taxes imposed by the City of New York upon various types of businesses, including utilities, in order to raise revenue for relief purposes. (Local Laws, 1933, No. 19 of City of New York; Local Laws, 1934, Nos. 10, 20, 24 of City of New York [published as Nos. 10, 21, 25]; Local Laws, 1935, Nos. 2, 30 of City of New York; Local Laws, 1936, No. 30 of City of New York.) By 1937 the utility excise tax rate thus imposed by the City of New York was 3% of the gross receipts of utilities. Then in July, 1937, the State of New York, which had the primary responsibility for the relief and welfare of its citizens, imposed a 2% tax on the gross receipts of defined public utilities in the State and limited the city utility excise tax to 1%. (See N. Y. Legis. Doc., 1937, No. 91; Tax Law, § 186-a, as added by L. 1937, ch. 321; General City Law, § 20-b, as added by L. 1937, ch. 321.) Thus, commencing on July 1, 1937, the City of New York was limited to a 1% excise tax on utilities doing business in the city of New York. In the ensuing year leading up to July 1, 1938, when the definition of " telegraphic service " here involved was first adopted, the City of New York found itself confronted not only with the described diminution in the tax receipts available to it directly for relief purposes, but also with a general drop in sales tax receipts and an increase in the relief requirements of the city. (See *New York Times,* March

23, 1938, p. 15, col. 1; June 26, 1938, section 4, p. 7, col. 6.) Moreover, in the month of June, 1938, the city council of the city of New York had before it the decision rendered by the New York Supreme Court on June 4, 1938, in *Empire City Subway Co.* v. *City of New York* (168 Misc. 775) wherein the court indicated that the scope of the city excise tax would not be expanded by judicial construction but, rather, confined to its terms. And it was in June of 1937 that the administrative ruling was made which induced the plaintiff herein to initiate the litigation which resulted in the ultimate determination that the excise tax as it then existed did not apply to the plaintiff. In view of the urgent need of the City of New York in 1938 for additional excise revenue to meet its relief needs, and in view of the then pending plausible and ultimately persuasive contention by Holmes that it was not governed by the utility excise tax which was then on the books, I conclude that the definition of " telegraph service " adopted on July 1, 1938, was intended to bring within the scope of the utility excise tax a business such as that conducted by Holmes.

Holmes insists, however, that if the utility excise tax be construed to comprehend the business activities of Holmes, then the tax could be imposed upon any nonutility, furnishing nonutility services, if that business uses electric or telegraph wires to convey messages or information of any kind. The *reductio ad absurdum* postulated by Holmes is that the tax would extend to the electrical transmission of signals or information by passenger elevators or by moving picture projectors, etc. It is not necessary to decide whether the excise tax would be applicable to such other enterprises. It is sufficient that the law by its language and intent covers Holmes. If the legislative body failed to use the most felicitous language to express and to bound its intent, it is not the function of this court to penalize it by rendering nugatory language plainly intended to be effective at least in the instance of enterprises carrying on the kind of business which the plaintiff conducts. Moreover, it seems abundantly clear to me that as Holmes enjoys special privileges for the use of the public streets in its business, the hypothetical situations conjured by plaintiff do not preclude my conclusion that Holmes falls within the utility excise tax of the City of New York. For in view of the purpose and pattern of the utility excise tax to include those enterprises, whether utilities or otherwise, which are in the nature of utilities because they profit from the use of public property, franchises, facilities or other

special privileges, I find that Holmes, being in the nature of a utility, properly comes within that class of taxpayers defined by the utility excise tax ordinances as utilities and quasi-utilities.

And it is the circumstance that Holmes enjoys special rights and privileges in connection with the use of the public streets of the city of New York which disposes of the contention of Holmes that if Holmes is within the utility excise tax of the City of New York then the tax is invalid as based upon an unreasonable and arbitrary classification. For in *Merchants Refrig. Co.* v. *Taylor* (275 N. Y. 113, 123) where the Court of Appeals held invalid as arbitrary an excise tax upon that portion of the gross receipts of the taxpayer attributable to the income from the taxpayer's refrigerated warehouses, the court nevertheless sustained as valid the same tax to the extent that it was imposed upon the income received from the transmission of refrigeration by the taxpayer by means of pipes laid in the streets. (See, also, *Matter of 436 W. 34th St. Corp.* v. *McGoldrick,* 288 N. Y. 346, 351.) In my opinion, the enterprise which enjoys special benefits and use of property belonging to the public can hardly complain that a tax premised upon this characteristic is an arbitrary and invalid classification.

Finally, I turn to the contention of the plaintiff that the excise tax here under review is not authorized by the New York State enabling legislation. The argument is that section 20-b of the General City Law (added by L. 1937, ch. 321) authorized and empowered municipalities "to adopt and amend local laws imposing in any such city a tax such as is imposed by section one hundred eighty-six-a of the Tax Law"; that section 186-a of the Tax Law (added by L. 1937, ch. 321) authorizes a State utility tax in language identical with that contained in the New York City utility excise ordinances prior to July 1, 1938; and that since prior to July 1, 1938, the New York City utility excise tax did not cover Holmes, therefore section 186-a of the State Tax Law does not cover Holmes and section 20-b of the General City Law would prevent the City of New York from adopting an ordinance which would extend its utility excise tax to an enterprise such as Holmes. This department has recently thoroughly canvassed the historical background leading up to the adoption by the State of New York of section 186-a of the Tax Law and section 20-b of the General City Law (*Matter of Brooklyn Union Gas Co.* v. *McGoldrick,* 270 App. Div. 186, affd. 298 N. Y. 536). By these enactments, the State was to impose directly, for relief purposes, excise taxes on speci-

fied utilities to the extent of 2% of the gross receipts of each such utility and to limit the taxing power of the municipalities in this area to 1% of such income. It was not intended and it was nowhere stated that the foregoing State enactments served to freeze as of 1937 or otherwise limit the types of enterprises which could be taxed by municipalities. Indeed, in *Matter of 436 West 34th St. Corp.* v. *McGoldrick* (*supra*) the Court of Appeals upheld as valid an excise utilities tax imposed by the City of New York upon a landlord who submetered electricity to his tenants for a separate consideration, pursuant to a 1940 amendment to the New York City utilities tax law (Local Laws, 1940, No. 80 of City of New York), although prior to that 1940 amendment neither the city nor the State could exact such an impost under the then obtaining tax laws (*Matter of 339 Central Park West,* v. *Graves,* 260 App. Div. 265, affd. 284 N. Y. 691; *Matter of 320 West 37th St.* v. *McGoldrick,* 281 N. Y. 132). Again in *Matter of Brooklyn Union Gas Co.* v. *McGoldrick* (*supra*) when the Appellate Division for this department considered the contention of the city that it could tax at any rate receipts of a utility corporation not taxable under section 186-a, the court did not state or even imply that the city was lacking in any power to tax such a utility, but instead declared (pp. 193–194): '' As to the city's claim that it is free to tax any receipts of utility corporations not taxed by the State under section 186-a at any rate it sees fit, we think that such a construction would clearly defeat what appears to have been the purpose of the Legislature in limiting the aggregate tax of the State and the cities thereof, to a total of 3%.''

Implicit in this statement is the recognition that the city may tax a utility corporation not taxable under section 186-a, but in that connection it was held that it may not fix the tax at more than 3%. With this construction of section 186-a I agree.

For the reasons set forth, I conclude that the relief sought must be denied, the complaint dismissed, and judgment entered for defendants. At the trial a motion was made by the plaintiff to strike out the testimony of Edward Collins offered by the defendants. That motion is granted. All other motions made at the trial upon which decision was reserved are denied. The foregoing constitutes the decision of the court. Judgment is directed accordingly in favor of the defendants.